**MICRO CHEMICAL, INC,**
**Plaintiff–Appellant,**

v.

**GREAT PLAINS CHEMICAL CO., INC.,**
**Lextron, Inc., and Robert C. Hummel,**
**Defendants–Cross/Appellants,**

**and**

**William Pratt, Defendant.**

**Nos. 95–1504, 95–1514.**

United States Court of Appeals,
Federal Circuit.

Jan. 3, 1997.

Rehearing Denied March 3, 1997.

Timothy B. Dyk, Jones, Day, Reavis & Pogue, Washington, D.C., argued, for plaintiff-appellant. With him on the brief were John P. Pinkerton, Ross Spencer Garsson, and Carl F. Schwenker, Dallas, TX, and Gregory A. Castanias, Washington, D.C. Of counsel on the brief was John Mozola, Sprouse, Mozola, Smith & Rowley, P.C., Amarillo, TX.

Dennis J. Mondolino, Hopgood, Calimafde, Kalil & Judlowe, New York City, argued for defendants-cross/appellants. With him on the brief were Michael F. Hurley and Edward M. Reisner.

Before ARCHER, Chief Judge, MAYER and LOURIE, Circuit Judges.

LOURIE, Circuit Judge.

Micro Chemical Inc. appeals from the judgment of the United States District Court for the District of Colorado that U.S. Patent 4,733,971 is invalid and was not infringed by the defendants. *Micro Chem. Inc. v. Great Plains Chem. Co.,* 900 F.Supp. 1386 (D.Colo. 1995). Great Plains Chemical Co., Inc., Lextron, Inc., and Robert C. Hummel (collectively "Lextron") appeal from the district court's judgment that the patent was not obtained by means of inequitable conduct. *Id.* Because the district court erred in concluding that the patent is invalid, but did not err in concluding that certain of the asserted claims were not infringed and that the patent was not obtained by means of inequitable conduct, we affirm-in-part and reverse-in-part. We remand for a determination of infringement of certain asserted claims not addressed by the district court.

## BACKGROUND

The '971 patent concerns a method and apparatus for adding small amounts of ingredients ("microingredients") to livestock or poultry feed in order to promote growth and to prevent sickness. Figure 4 of the patent is a front view of the internal parts of the machine (10). The microingredients are stored in bins (68, 74), below which is a weighing hopper (122) supported by a "weigh frame" (34). A mixing vessel (170) is located beneath the weighing hopper and is supported by a separate main frame (46). The machine is controlled by a "weigh microcomputer" and a machine sequencing microcomputer. The patent discloses a block diagram for the computer components and flow charts illustrating software for controlling the operation of the computers and the machine. An operator programs the desired types and amounts of microingredients into the machine, and the computers control the machine in order to weigh microingredients in the weighing hopper, dispense them into the mixing tank, and mix them with a liquid carrier such as water in order to form a slurry to be sprayed onto the feed.

FIG. 4

The machine includes elements for isolating the sensitive equipment of the weighing mechanism from the adverse effects of vibrations or other disturbances that might affect its accuracy. These include isolation pads (44) that dampen vibrations transmitted to the "weigh frame" from the floor on which it is placed. The separate "weigh frame" (34) isolates the weighing equipment from the mixing equipment and other components, which are supported by their own frame (46). The mixing equipment generates substantial vibrations caused by agitation during the mixing process, and use of a separate frame reduces the transfer of those vibrations to the weighing system. An antisway bar (276) dampens transverse motion. The machine is enclosed by panels (12), which shield its components from dust and other contaminants and also protect the weighing system from external forces such as wind or other jarring contact that may affect its accuracy. The panels (12) are shown in Figure 1 of the patent. According to the specification of the patent, the isolation of the weighing equipment results in consistently accurate weighing of microingredients.

1542

FIG. 1

Claim 1, which recites the isolation feature, reads as follows:

1. An apparatus for measuring, dispensing, and delivering microingredient feed additive concentrates in small but accurate amounts in a liquid carrier slurry into a livestock or poultry feed ration shortly before the delivery of said feed ration to the animals for consumption, said apparatus comprising:

multiple storage means for storing separately a plurality of different microingredient feed additive concentrates;

multiple dispensing means for dispensing separately several additive concentrates from said multiple storage means;

weighing means for determining the weights of said different additive concentrates dispensed;

isolating means for isolating said weighing means from influences affecting the weighing function of said weighing means so accurate weight determinations are obtained;

control means for controlling separately the operation of said plural dispensing means in response to weight determinations of said weighing means to control the weight of additive concentrates dispensed;

receiving means for receiving additive concentrates dispensed from said storage means;

mixing means for mixing a liquid carrier with the additive concentrates dispensed into said receiving means to form a slurry of said carrier and the dispensed additive concentrates; and

delivery means for delivering said slurry to a slurry-receiving station for mixing with a feed ration.

The patent also discloses and claims a method of delivering microingredients using sequential and cumulative weighing. During sequential weighing, the weighing hopper is inverted in order to dump each weighed microingredient into the mixing tank and it is then reverted to receive and weigh the next microingredient. During cumulative weighing, microingredients are repeatedly dumped on top of one another in the weighing hopper as a computer resets a scale to zero after each microingredient is added to the weighing hopper. Claim 47, which includes the sequential and cumulative weighing feature, reads as follows:

47. A method of dispensing and delivering microingredient feed additives into a livestock feed ration shortly before deliver-

ing the feed ration to the livestock for consumption, comprising the steps:

storing separately multiple said additives in concentrate form;

dispensing predetermined weights of selected said additive concentrates into a liquid carrier with no substantial intermixing of the additive concentrates before they enter the liquid carrier;

intermixing the additive concentrates in the liquid carrier to dilute, disperse, and suspend them and form a liquid carrier-additive slurry;

directing the slurry to a receiving station while maintaining the suspension and dispersion of the additives until delivered into a feed ration; and

determining the predetermined weights of selected additives by weighing each additive sequentially and cumulatively in a common weighing container while maintaining separation of the different concentrates in said container.

The development of the '971 invention began in 1984 when the inventor, William C. Pratt, conceived the idea of a weighing and delivery system having improved accuracy compared to prior art systems. In December 1984, before the critical date of February 26, 1985,[1] Pratt offered to sell a weighing machine to Lee Isaac, manager of the Sunbelt feedlot located in Hugoton, Kansas. Isaac rejected his offer and instead purchased a machine sold by Lextron. Although Pratt had built and tested a weighing system for the machine allegedly offered at that time, he had not constructed a slurry or mixing system for use with the weighing system. He did have a "rough" sketch of the mixing system.

In January 1985 Pratt constructed a prototype that included both the weighing and the mixing systems. He encountered several problems during testing of this prototype.

His primary challenge was in isolating the weighing system from the adverse effects of vibrations caused by the mixing system and by other sources. Because of its sensitivity, the weighing system was liable to provide incorrect measurements as a result of these vibrations. Pratt constructed another prototype in February 1985, but it also did not accurately weigh microingredients consistently. In late February he incorporated additional elements into that prototype in order to achieve adequate isolation of the weighing system. The improved February prototype contained as isolating elements a separate "weigh frame," rubber isolation pads, and longitudinal and lateral stabilizers. He also added a three-speed mixer to the mixing tank to intermix the microingredients with a liquid carrier and he used two RCA computers for controlling operation of the machine. It produced satisfactory results when tested and it was presented to a group of Tulsa bankers on February 28, 1985, after the critical date.

Three days after the patent issued, Micro sued Lextron, Great Plains Chemical Co., Inc., and Robert C. Hummel[2] for infringement.[3] Micro alleged that Lextron infringed the patent by manufacturing and selling microingredient additive machines referred to as "cumulative weigh" and "weigh/dump" machines. Micro also alleged that Lextron induced infringement by providing what it referred to as "no-mix" machines to feedlots owned by Cactus Feeders. Lextron counterclaimed for a declaratory judgment of invalidity and noninfringement.[4] In March 1993, the district court conducted a bench trial of all patent-related issues, having separated out the damages issues.

The district court held that the asserted claims of the patent were invalid under section 102(b), determining that the December 1984 offer to Isaac triggered the on-sale bar.[5]

---

1. The '971 patent has a filing date of February 26, 1986 and therefore a critical date of February 26, 1985 for purposes of 35 U.S.C. § 102(b).

2. Great Plains Chemical Co., Inc. is Lextron's predecessor company. Robert C. Hummel is the president of Lextron.

3. Micro asserted infringement of claims 1, 3, 9, 11, 13, 45, 47, 48, 49, 63, 65, 67, 68, 74, 79, 89, 90, 91, 92, 93, and 94.

4. Lextron counterclaimed against both Micro and its president, Pratt.

5. "A person shall be entitled to a patent unless ... the invention was ... on sale in this country,

The district court held that all the claims of the '971 patent were also invalid under section 103, concluding that the invention would have been obvious to one skilled in the art based on a combination of the features of two prior art microingredient machines. It concluded that Lextron did not directly infringe claims 1, 3, 9, 11, 13, and 45, and did not induce infringement of claims 1, 3, 45, 63, 74, 93, and 94. The district court did not address infringement of the other asserted claims. It also held that Pratt and his representative, James S. Leigh, did not engage in inequitable conduct in the procurement of the patent. Accordingly, the district court entered judgment for Lextron on Micro's complaint and on Lextron's counterclaim for a declaratory judgment of invalidity and noninfringement.

Micro now appeals to this court, challenging the district court's judgment concerning validity and infringement. Lextron cross-appeals, asserting that the district court erred in concluding that no inequitable conduct occurred.

## DISCUSSION

On appeal from a bench trial, we review a district court's decision for errors of law and clearly erroneous findings of fact. Fed. R.Civ.P. 52(a); see Interspiro USA, Inc. v. Figgie Int'l Inc., 18 F.3d 927, 930, 30 USPQ2d 1070, 1072 (Fed.Cir.1994).

### A. The On–Sale Bar

Micro argues that there was no sale of, or definite offer to sell, the invention prior to the critical date. It asserts that the invention could not have been on sale at the time of the alleged offer to Isaac because the invention did not exist at that time. According to Micro, as of the December date, Pratt had not yet designed anything patentable and the public therefore could not be in possession of his invention.

Lextron responds that the offer to Isaac in December 1984 was properly found to constitute an on-sale bar. According to Lextron,

more than one year prior to the date of the application for patent in the United States...."

Pratt did have an invention to sell to Isaac at that time, insisting that Pratt had already built three prototypes and had reduced the invention to practice approximately two weeks after the offer was made. Furthermore, Lextron argues that, according to our decision in UMC Elecs. Co. v. United States, 816 F.2d 647, 2 USPQ2d 1465 (Fed.Cir.1987), cert. denied, 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988), a prior reduction to practice is not a prerequisite to an on-sale bar and that even before the reduction to practice had occurred, the offer to Isaac constituted a bar.

Application of the on-sale bar under section 102 is a question of law based upon underlying issues of fact. See KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc., 997 F.2d 1444, 1451, 27 USPQ2d 1297, 1303 (Fed. Cir.1993); UMC, 816 F.2d at 657, 2 USPQ2d at 1472. A determination that an invention was on sale within the meaning of section 102(b) requires that "the claimed invention asserted to be on sale was operable, the complete invention claimed was embodied in or obvious in view of the device offered for sale, and the sale or offer was primarily for profit rather than for experimental purposes." KeyStone, 997 F.2d at 1451, 27 USPQ2d at 1303. In UMC, we stated that a reduction to practice of the claimed invention is not a prerequisite for triggering the on-sale bar. UMC, 816 F.2d at 656, 2 USPQ2d at 1471. Rather, "[a]ll of the circumstances surrounding the sale or offer to sell, including the stage of development of the invention and the nature of the invention, must be considered and weighed against the policies underlying section 102(b)." Id., 816 F.2d 647, 2 USPQ2d at 1471–72.

We agree with Micro that the invention of the patent was not offered for sale before the critical date within the meaning of section 102(b). The evidence compels a conclusion that Pratt's invention was clearly not completed when he made the December offer. At the time of the alleged offer, Pratt had developed a prototype for the weighing system; however, he had only made a sketch

35 U.S.C. § 102(b) (1994).

of the mixing system and had not yet designed the elements for isolating the weighing system. The invention was thus not close to completion and Pratt was not confident at that time that the invention would work for its intended purpose. Pratt testified that, as of December 28, 1984, "[t]here had been no construction of the mixing tank or the slurry system portion of the machine at that time." He stated that what he had at that time was a proposed configuration. At the time of the alleged offer to Isaac, Pratt had not reduced the invention to practice, nor had he substantially completed the invention. Because Pratt was not close to completion of the invention at the time of the alleged offer and had not demonstrated a high likelihood that the invention would work for its intended purpose upon completion, his December 1984 "offer" could not trigger the on-sale bar.

In the *UMC* case, we held a patent invalid on the basis of an on-sale bar, even though the invention had not been reduced to practice. Although Lextron argues here that *UMC* requires that we affirm the invalidity of Micro's patent, we do not agree. The invention in *UMC* was an aviation counting accelerometer ("ACA"), which was used in aircraft for sensing and determining how many times the aircraft had been subjected to predetermined levels of acceleration. ACAs had previously used electro-mechanical sensors, which generated a mechanical signal to indicate levels of acceleration, and at times produced an erroneous signal as a result of mechanical vibrations or stresses. The new ACA used an analog transducer, which produced an electrical signal that could be filtered to remove the adverse effects of mechanical vibrations. UMC made a definite offer to sell the new ACA before the critical date of the patent-in-suit. At the time of the offer, the new ACA was substantially complete. The court stated that the "prior art devices embodied each element of the claimed invention, save one, and that portion was available and had been sufficiently tested to demonstrate to the satisfaction of the inventor that the invention as ultimately claimed would work for its intended purpose." *UMC*, 816 F.2d at 657, 2 USPQ2d at 1472. The invention was substantially com-

pleted and there was reason for a high degree of confidence that it would work for its intended purpose. *See Seal–Flex, Inc. v. Athletic Track and Court Constr.*, 98 F.3d 1318, 1322, 40 USPQ2d 1450, 1452 (Fed.Cir. 1996).

*UMC* thus stands for the proposition that, even though the technical requirements of a reduction to practice have not been met, a sale or a definite offer to sell a substantially completed invention, with reason to expect that it would work for its intended purpose upon completion, suffices to generate a statutory bar. On the other hand, the court stated that "[i]f the inventor had merely a conception or was working towards development of that conception, it can be said there is not yet any 'invention' which could be placed on sale." *UMC*, 816 F.2d at 657, 2 USPQ2d at 1472. The facts here fit the UMC opinion's hypothetical statement of facts which would fail to constitute a bar much more closely than they fit the actual facts in that case which the court found constituted a bar. We conclude that the undisputed facts concerning Pratt's alleged offer to sell do not constitute an on-sale bar within the meaning of 35 U.S.C. § 102(b) and that the district court erred in holding that they did.

### B. *Obviousness*

Micro argues that the district court erred in concluding that the invention of the asserted claims would have been obvious at the time it was made to one skilled in the relevant art. According to Micro, the court erred by combining elements in the prior art without any teaching or suggestion to do so. Lextron responds that the district court correctly applied the law on obviousness.

 A determination of obviousness under 35 U.S.C. § 103 is a legal conclusion involving factual inquiries. *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1050, 5 USPQ2d 1434, 1438 (Fed.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). The district court held that the invention of the patent would have been obvious at the time it was made based upon the combination of a prior art weighing machine and prior art volume machines. The prior

art weighing machine was designed by Sherman Brewster and is referred to as "the Brewster machine." It weighed and dispensed the microingredients sequentially, but had no system for positive intermixing of microingredients with a liquid carrier. When Brewster's customers wanted to use a liquid carrier, the machine would dump the microingredients into a tub of water, which would then be flushed and pumped into a truck containing feed; any mixing occurred only incidentally. The relevant prior art volume machines were manufactured by Lextron. They operated by dispensing microingredients into a mixing tank partially filled with water. The machines included a motor-driven propeller shaft in the mixing tank for mixing the microingredients and the water carrier in order to form a homogenous slurry.

The district court found that one skilled in the art would have been aware of the Brewster weighing machine and that it would have been obvious to combine the features of that machine with those of the volume machines in order to obtain more accurate dispensing of feed additives. The court thus combined the weighing feature of the Brewster machine with the mixing feature of the volume machines, the motivation to combine apparently arising from the knowledge of those skilled in the art of the need for more accurate dispensing of microingredients.

Micro argues, however, that there was no motivation to combine the Brewster weighing machine with the mixers of the volume machine, because the latter produced vibrations that would adversely affect the Brewster machine's sensitive weighing equipment. According to Micro, the Brewster machine failed to adequately isolate the weighing mechanism from vibrations or other motions and consequently performed inaccurately. Lextron responds that the Brewster machine contained an accurate weighing mechanism, as evidenced by the testimony of Brewster's customers who operated feedlots using the machine, and that by having a separate frame for its slurry delivery system, it would not have the accuracy and isolation difficulties Pratt's invention avoids.

We agree with Micro that the claimed invention would not have been obvious in view of the Brewster weighing machine and the Lextron volume machines. A determination of obviousness must involve more than indiscriminately combining prior art; a motivation or suggestion to combine must exist. *ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577, 221 USPQ 929, 933 (Fed.Cir.1984). As we recently stated:

> Such a suggestion may come expressly from the references themselves. *See, e.g., In re Sernaker*, 702 F.2d 989, 994, 217 USPQ 1, 5 (Fed.Cir.1983). It may come from knowledge of those skilled in the art that certain references, or disclosures in the references, are known to be of special interest or importance in the particular field. *Cf. Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 297 n. 24, 227 USPQ 657, 667 n. 24 (Fed.Cir. 1985) (stating that the knowledge of one skilled in the art may provide the "teaching, suggestion, or inference" to combine references), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986). It may also come from the nature of a problem to be solved, leading inventors to look to references relating to possible solutions to that problem. *See, e.g., Application of Rinehart*, 531 F.2d 1048, 1054, 189 USPQ 143, 149 (CCPA 1976) (considering the problem to be solved in a determination of obviousness).

*Pro-Mold and Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573, 37 USPQ2d 1626, 1630 (Fed.Cir.1996). Here, the record contains no evidence of a motivation or suggestion to combine the Brewster weighing machine with the Lextron volume machines. In fact, one skilled in the art would not have been motivated to combine the Brewster machine with the volume machines, because the vigorous motion of the mixing elements in the volume machines would have been expected to cause inaccurate weighing. The prior art therefore led away from the idea of combining the features of Brewster with the features of the volume machines. Pratt's invention solved the problem by going against the prior art and successfully combining accurate weighing with accurate delivery of microingredients. Pratt was able to

combine the features of weighing and positive intermixing only because he added isolation means to achieve consistently accurate weighing in an environment subject to vibrations from mixing equipment.

Pratt's extensive efforts to solve the problem of isolating the weighing system indicate the absence of a suggestion to combine the Brewster machine with the positive intermixing elements of the volume machines. *See In re Dow Chem. Co.*, 837 F.2d 469, 473, 5 USPQ2d 1529, 1532 (Fed.Cir.1988) (stating that the "five to six years of research that preceded the claimed invention" was entitled to fair evidentiary weight in a determination of nonobviousness). These efforts by Pratt tend to show that one skilled in the art would have had no reasonable expectation of success in combining the prior art machines in question. *See id.*, 837 F.2d 469, 5 USPQ2d at 1531 ("The consistent criterion for determination of obviousness is whether the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable likelihood of success, viewed in the light of the prior art."). Long-felt need in the face of prior art later asserted to lead to a solution tends to negate the proposition that the combination of such prior art would have been obvious. We therefore conclude that the district court erred in holding the subject matter of the disputed claims to have been obvious.

## C. *Direct Infringement*

Micro argues that the district court erred in its construction of the isolating means of the claims. Lextron responds that the district court properly found that the accused device did not contain a structure equivalent to the isolating means. Specifically, Lextron states that its accused machines achieved isolation by using a rigid mainframe rather than rubber base plates, silicon sealants rather than a separate "weigh frame," and compression mounting of the weighing hopper rather than antisway bars.

 Determining whether a patent claim has been infringed requires a two-step analysis: "First, the claim must be properly construed to determine its scope and mean-

ing. Second, the claim as properly construed must be compared to the accused device or process." *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*, 15 F.3d 1573, 1576, 27 USPQ2d 1836, 1839 (Fed.Cir.1993). Claim construction is a question of law, which we review *de novo*. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed.Cir.1995) (in banc), *aff'd*, ── U.S. ──, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). The application of a properly construed claim to an accused device is a question of fact, which we review for clear error. *General Am. Transp. Corp. v. Cryo–Trans, Inc.*, 93 F.3d 766, 769, 39 USPQ2d 1801, 1803 (Fed.Cir.1996).

The district court held that the patent was not literally infringed. In particular, it found that the accused machine did not contain the isolating means required by the asserted claims 1, 3, 9, 11, 13, and 45. The court failed to address whether the remaining asserted claims were infringed.

 We agree with the district court that the accused device did not use structure corresponding to the isolating means of asserted claims 1, 3, 9, 11, 13, and 45. Literal infringement of a claim containing a means clause requires that the accused device perform the identical function as that identified in the means clause and do so with structure which is the same as or equivalent to that disclosed in the specification. *Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1042, 25 USPQ2d 1451, 1454 (Fed.Cir.1993). The patent discloses three primary structures for achieving isolation of the weighing system: rubber base plates, a "weigh frame" separate from the main frame, and an antisway bar attached to the weighing hopper for dampening transverse motions. In comparison, the accused device isolates its weighing system by using a rigid mainframe rather than rubber base plates, silicon sealants rather than a separate "weigh frame," and compression mounting of the weighing hopper rather than antisway bars. The district court found the structures in question to be significantly different, *i.e.*, structurally nonequivalent, and we conclude that its fact-finding was not clearly erroneous.

Micro argues that the patent disclosed other structures for achieving isolation that were present in the accused device. In particular, Micro asserts that the patent disclosed, and the accused device contained, protective panels, electrical conduits, and rubber isolation pads. We do not agree that these structures meet the claims. First, it is not clear from the record that the protective panels in the accused device performed the function of isolation. A Lextron witness testified that when he observed accused machines with their side panels removed, the machines did not appear to be affected, that air movement did not affect the hopper. Isolation was apparently not the function of the side panels. It has thus not been established that the protective panels in the accused device performed the function set forth in the claims. Likewise, the testimony cited by Micro as establishing that the accused device contained electrical conduits and rubber isolation pads fails to identify the function of those elements and thus fails to establish identical functionality. *See id.,* 983 F.2d 1039, 25 USPQ2d at 1454 (stating that for a means limitation to read on an accused device it must perform the identical function as specified in the claims).

Micro also argues that the district court made errors of law in its infringement analysis. It cites the district court's statement that the "accused structures in the Lextron weigh machines were also all present, save one, in the Lextron prior art volume machines." Inventions are often a new combination of prior art elements, and thus the fact that particular elements of a claim are present both in the prior art and in an accused device does not negate infringement of a claim consisting of a combination of elements. However, even if the district court's reasoning was in error, as argued by Micro, it does not change the outcome of our review of the infringement determination, as we conclude that the district court's findings concerning infringement were not clearly erroneous. Accordingly, the district court's statement, even if construed as Micro argues, was harmless error. *See* Fed.R.Civ.P. 61.

Micro argues that the district court erred in requiring equivalents for all three primary disclosed structures in order to meet the isolating means limitation. According to Micro, the disclosed structures are alternatives; therefore an equivalent to any one of the structures is sufficient to meet the claim limitation. The district court analyzed all three accused structures, finding that none of them was equivalent to those disclosed in the patent. In particular, the district court stated, with our emphasis added, that "[n]one of these structures, either *alone* or in combination, can properly be considered 'equivalent' under § 112(6)." The court thus found that the accused machines failed to contain an equivalent to any of the disclosed structures. It did not clearly err in its conclusion of lack of infringement.

Micro also argues that the court erred in failing to make infringement findings regarding the remaining asserted claims, consisting of claims 47, 48, 49, 63, 65, 67, 68, 74, 79, 89, 90, 91, 92, 93, and 94. We agree. Without findings of fact and conclusions of law, we are unable to review the issue of infringement of those claims. *See* Fed.R.Civ.P. 52(a) ("In all actions tried upon the facts without a jury ... the court *shall* find the facts specially and state separately its conclusions of law thereon ....") (emphasis added). Therefore, we must remand for determination of infringement of the remaining asserted claims. We note that not all of the asserted claims include the isolating means limitation. In particular, some of them are method claims which include an isolating *step* rather than an isolating means (see 35 U.S.C. § 112, para. 6). Other asserted claims define a sequential and cumulative weighing feature and lack either an isolating means or step. Upon remand, the district court should determine whether the remaining asserted claims were infringed.

## D. *Inducement to Infringe*

Micro argues that the district court clearly erred in finding no inducement to infringe the asserted claims. Specifically, it argues that the district court incorrectly found that the Cactus Feeders machine did not infringe the claims because its use of molasses failed to meet the liquid carrier limitation of the claims in question. In support of its argu-

ment, Micro states that U.S. Patent 3,437,075 ("the Hawes patent"), cited in the '971 patent, identifies molasses as a liquid carrier. Lextron responds that the district court correctly found no direct infringement and hence no inducement to infringe because molasses is not a liquid carrier as used with the accused machines.

■ There can be no inducement to infringe absent direct infringement. *Met–Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 231 USPQ 474, 476 (Fed.Cir.1986). The district court did not clearly err in its finding that molasses failed to meet the liquid carrier limitation of the claims in question. The record supports the conclusion that molasses, when used as a liquid microingredient, was not a liquid carrier. The Hawes patent, which was part of the relevant prior art, refers to molasses as a liquid microingredient, rather than a liquid carrier. Thus, the district court did not clearly err in finding that the Cactus Feeder's machines combined microingredients with liquid microingredients, rather than mixing microingredients with a liquid carrier, as required by the claims.

## E. *Inequitable Conduct*

In its cross-appeal, Lextron argues that Pratt and Leigh engaged in inequitable conduct in three ways. According to Lextron, they deliberately misled the examiner concerning the state of the Brewster machine, intentionally failed to inform the U.S. Patent and Trademark Office ("PTO") of their knowledge concerning the prior art Lextron volume machine, and intentionally and falsely described the need for accuracy in delivering microingredients. Micro responds that there was no evidence of intent to mislead the examiner and that the volume machine was cumulative prior art and hence not material.

■ A determination of inequitable conduct is committed to a district court's discretion. Accordingly, we review the court's judgment for abuse of discretion. *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876, 9 USPQ2d 1384, 1392 (Fed.Cir.1988), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). To overturn a discretionary ruling of a dis-

trict court, "the appellant must establish that the ruling is based on clearly erroneous findings of fact or on a misapplication or misinterpretation of applicable law, or evidences a clear error of judgment on the part of the district court." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178, 33 USPQ2d 1823, 1827 (Fed.Cir.1995).

■ Inequitable conduct consists of an "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Id.*, 48 F.3d 1172, 33 USPQ2d at 1826. One alleging inequitable conduct must prove the threshold elements of materiality and intent by clear and convincing evidence. *Id.*, 48 F.3d 1172, 33 USPQ2d at 1826–27. The district court must then weigh the threshold findings of materiality and intent in light of all the circumstances to determine whether they warrant a conclusion that inequitable conduct occurred. *Id.*

■ The district court held that Micro's representatives did not engage in inequitable conduct in the prosecution of the '971 patent. The court found that Leigh and Pratt did not intend to mislead the PTO through their statements characterizing the Brewster machine and that the Lextron volume machine was cumulative prior art and hence not material; thus Leigh and Pratt did not intend to mislead the PTO through their failure to cite it. The court did not make specific findings with respect to the statements about the need for accuracy in delivering microingredients. In spite of its holding that no inequitable conduct occurred, the district court held that the patent is unenforceable, apparently based upon its invalidity holding.

Lextron argues that Micro's representatives deliberately misled the PTO concerning the qualities of the Brewster weighing machine. According to Lextron, the subjective statements in the '971 patent concerning the Brewster machine were intentionally drafted to be misleading. The following are the statements in question:

It is believed that at least one weigh-type additive concentrate delivery system has been tried, but unsuccessfully. It is be-

lieved that such system weighed and then dispensed each additive separately and sequentially. It is believed that such system was unsuccessful because it was too slow and too inaccurate for handling additive concentrates in a feedlot environment.

'971 patent, col. 2, lines 12–18 (Background of the Invention). Lextron argues that Micro had a duty to verify the facts supporting their statements and that it did not do so. Lextron also cites a statement in an Information Disclosure Statement that Leigh submitted to the PTO. In describing the Brewster machine, he stated that "[f]rom applicant's inspection it appears that such machines ... all lacked means for isolating the weigh components from external influences during weighing and were therefore highly inaccurate."

We agree with the district court that the prosecution history reviewed as a whole fails to evidence an intent to mislead the PTO. In the portion of the patent quoted above, Pratt stated his personal belief, rather than a representation of facts. Furthermore, in another Information Disclosure Statement, Leigh provided a detailed description of the Brewster machine based upon personal inspection. Leigh identified the alleged isolating means of the Brewster machine and provided reasons why they failed to adequately achieve isolation. In particular, Leigh stated in describing the Brewster machine that the "load cell frame was connected by short, stiff rubber straps to the main frame of the apparatus," and he argued that:

(5) The short rubber straps mounting the load cell frame to the main frame of the apparatus appeared to be so stiff that they would not provide any appreciable isolation of the weighing components of the apparatus from the main frame.

(6) Also apparently contributing to the lack of isolation and an appararent [sic] source of inaccuracy in the weighing would be the metal hydraulic fluid conduit which in effect connects the hydraulic cylinder on the weigh hopper to the main frame because of its stiffness and spring-like action.

Thus, the record evidences suitable disclosure of the alleged isolating elements of the Brewster machine during prosecution of the patent along with proper arguments as to why those elements failed to adequately achieve isolation.

Lextron also argues that Pratt and Leigh intentionally failed to disclose to the PTO their knowledge of a Lextron volume machine, which it asserts was material prior art. According to Lextron, they were aware of the Lextron machine because of their participation in previous litigation involving that machine. Micro responds that the machine was cumulative prior art and hence not material.

The district court did not clearly err in determining that the Lextron volume machine was cumulative and hence not material. The district court found that the Lextron machine was cumulative to the Hawes patent and U.S. Patent 3,720,185 ("Aldous patent"), both of which were disclosed to the PTO. The district court found that the Aldous patent disclosed a mechanical mixer. It also found that the relevant limitations of the claims included "flow-inducing means," "intermixing," and "positive intermixing," and that the Hawes patent disclosed these elements. Lextron has not established that those conclusions were clearly erroneous. The relevant mixing elements of the Lextron volume machine were thus cumulative and not material.

Lextron further argues that Pratt and Leigh intentionally and falsely described the need for accuracy. According to Lextron, they falsely stated that accuracy must often be within half a gram, considering that government regulations allow for a thirty-five percent margin of error. Micro responds that Pratt and Leigh did not falsely describe the need for accuracy in dispensing microingredients, considering, for example, the industry literature cited in the '971 patent file history describing the need for accuracy in measuring microingredients.

The record contains evidence of industry literature describing the need for accuracy. Moreover, the prior art Hawes patent stated that improved accuracy allowed the use of highly toxic additives without risk of overdose. Pratt and Leigh reasonably could have relied upon that literature as establish-

ing a belief in a need for accuracy within the relevant industry, thereby negating intent to deceive the PTO. Accordingly, the district court did not abuse its discretion in determining that Pratt and Leigh did not engage in inequitable conduct in the procurement of the '971 patent.

We have considered the parties' other arguments and conclude that they are either unpersuasive or unnecessary for resolution of this appeal.

## CONCLUSION

The district court erred in holding that the '971 patent was invalid, but did not err in holding that Lextron did not infringe certain of the asserted claims and that the patent was not obtained through inequitable conduct. We therefore reverse the district court's judgment that the asserted claims are invalid under section 102(b), that the patent is invalid under section 103, and that the patent is unenforceable, and we otherwise affirm its judgment. We remand for a determination of infringement of the asserted claims not treated by the district court's opinion and, if necessary, damages.

## COSTS

Each party shall bear its own costs.

*AFFIRMED–IN–PART, REVERSED–IN–PART, AND REMANDED.*

MAYER, Circuit Judge, dissenting.

Because proper deference to the district court's findings of fact about the on sale bar compels the conclusion that Micro Chemical, Inc.'s patent is invalid, I dissent.

An inventor loses his right to a patent if he placed his invention "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b) (1994). To invalidate a patent under this section, the party asserting the on sale bar must demonstrate by clear and convincing evidence "that there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the

claimed invention or would have rendered the claimed invention obvious by its addition to the prior art." *UMC Elec. Co. v. United States,* 816 F.2d 647, 656, 2 USPQ2d 1465, 1472 (Fed.Cir.1987). Once a party asserting the bar proves the existence of an offer and either identity between the offered and patented apparatus or obviousness of the claimed invention in light of the offered apparatus and its teachings, the patent owner can preserve the validity of his patent by "com[ing] forward with evidence to counter that showing." *U.S. Envtl. Prods., Inc. v. Westall,* 911 F.2d 713, 716, 15 USPQ2d 1898, 1901 (Fed.Cir.1990).

The determination that a product was placed on sale under section 102(b) is a question of law, based on underlying facts. *Key-Stone Retaining Wall Sys. Inc. v. Westrock, Inc.,* 997 F.2d 1444, 1451, 27 USPQ2d 1297, 1303 (Fed.Cir.1993). While we review the district court's ultimate determination of a section 102(b) bar de novo, we review subsidiary facts supporting this conclusion for clear error. *Ferag AG v. Quipp, Inc.,* 45 F.3d 1562, 1566, 33 USPQ2d 1512, 1515 (Fed.Cir. 1995); *U.S. Envtl. Prods.,* 911 F.2d at 715, 15 USPQ2d at 1900.

In reviewing a district court's legal and factual determinations attending section 102(b), this court should resist blurring the distinction between its two separate inquiries, namely the existence of an offer for sale more than one year prior to the critical date, and the sale of subject matter that would fully anticipate or render obvious the claimed invention by its addition to the prior art. A definite and firm belief that the subject matter of a sale would not anticipate or render obvious the claimed invention does not transform a firm offer into a nebulous or indefinite one.

The district court made a well supported finding that William Pratt made a definite offer to Lee Isaac in 1984, based in part on the following facts:

Mr. Lee Isaac, co-owner of the Sunbelt Feedlot, confirmed that he had several meetings with Mr. Pratt . . . between October, 1984, and the beginning of January, 1985, during which Mr. Pratt offered to place a weigh machine at the Sunbelt Feedlot. Isaac testified that Mr. Pratt had told him "that it [MCI weigh machine] was

more accurate than the volume machine." Mr. Isaac also testified that it was his understanding that the machine was ... ready to be placed at the feedlot as soon as he would place an order.

Mr. Pratt testified that he reviewed these [no longer existing sales] files and created these notes [entitled "Need Patent Filing Date," one of which states "12/26/84— MWS machine offered *in person* for 6D e 6L—no date promised. MWS not final version."] after his attorney had explained the need to inform the Patent Office when the first public use or offer for sale of his patented invention occurred.

The Court is unable to reconcile the plain meaning of the words Mr. Pratt wrote and his purported explanation of what those words signify, particularly when the plain meaning of the words is confirmed by the sworn deposition testimony of a third party witness with no interest in this litigation.

In determining the credibility of Mr. Pratt's explanation of the meaning of the entries on this document, the Court notes that, although this document contains purely factual recitations created by Mr. Pratt for his own use before his patent application was filed, and was never sent to Mr. Pratt's attorney, the document was withheld during discovery on the basis of the attorney work product doctrine, and was misdescribed on plaintiff's privileged document list.

As the district court stated, the lack of discussion about price or payment terms during Pratt's offer to Isaac, although traditionally an indication that no offer was made, is here uninformative because standard practice in the industry was to give these machines to feedlots at no cost to encourage the purchase of microingredient additives—the primary business of both parties. The fact that Pratt did not describe his apparatus to Isaac beyond saying that it was a weigh machine more accurate than his volume machines, and the fact that Isaac did not understand how the invention worked, are similarly uninformative. In this case, a proper section 102(b) analysis does not focus on the purchaser's knowledge of details about the apparatus or how it works. *See,*

*e.g., RCA Corp. v. Data Gen. Corp.,* 887 F.2d 1056, 1060, 12 USPQ2d 1449, 1452 (Fed.Cir. 1989) (an offer or sale may invoke the statutory bar "even though no details are disclosed"); *King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 860, 226 USPQ 402, 407 (Fed.Cir.1985) ("When an executory sales contract is entered into (or offered) before the critical date, the purchaser must know how the invention embodied in the offer will perform. . . . The policies underlying the on sale bar, however, concentrate on the attempt by the inventor to exploit his invention, not whether the potential purchaser was cognizant of the invention. Accordingly, the purchaser need not have actual knowledge of the invention for it to be on sale"). Where the purchaser understands generally how an apparatus would perform, detailed knowledge is even less determinative. As this court stated in *Ferag,* 45 F.3d at 1568, 33 USPQ2d at 1516, "We emphasize that this is an objective test, and that at its heart lies the inventor's attempt to commercialize the invention. . . . [T]he measure of the bar is what was offered, not the patentee's intent."

The focus of the dispute below, and the only remaining proper question for our review of the district court's section 102(b) analysis, should be whether the apparatus offered to Isaac in December 1984 embodied or made obvious the patented invention. Our review of the findings of fact and conclusions of law on this question is driven by policy considerations that underlie this section. *See King Instrument,* 767 F.2d at 860, 226 USPQ at 407. Foremost among these is to prevent inventors from exploiting the commercial value of their inventions beyond statutory authorization. *See Envirotech Corp. v. Westech Eng'g Inc.,* 904 F.2d 1571, 1574, 15 USPQ2d 1230, 1232 (Fed.Cir.1990). To accomplish this, inventors are held to the strict requirement that they file their patent applications no more than one year after an attempt to commercialize the invention. Thus, we have held that an inventor does not avoid the on sale bar by continuing to add improvements to his invention after its commercialization. *See, e.g., Seal–Flex, Inc. v. Athletic Track and Court Constr.,* 98 F.3d 1318, 1324, 40 USPQ2d 1450, 1454–55 (Fed. Cir.1996).

Many factors may influence the determination of an on sale bar within this policy framework. However, because no single factor is controlling, the ultimate determination depends on the totality of the circumstances, that is to say, all of the facts surrounding the transactions, no two of which are alike. *Envirotech*, 904 F.2d at 1574, 15 USPQ2d at 1232. These individual circumstances require factual determinations about the level of skill and state of the art, the nature of the invention, the stage of its development when offered—including which elements of the later claimed patent were being offered and which would be implicitly suggested by the addition of offered elements to the prior art—and evidence of the inventor's intentions during the alleged commercialization. Although we may reverse a trial court's ultimate conclusion that the totality of evidence supports a result, we cannot reverse its factual findings themselves, absent a definite and firm conviction that a mistake has been committed. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

The district court's findings of fact on the second component of the on sale bar issue are as follows:

[Pratt] had made notes and drawings in December, 1984, illustrating the use of shock absorbing rods and stabilizers on the weigh hopper, flexibly mounting the subframe to prevent vibration transfer and enclosing of the entire machine in panels, to prevent air currents and hopper vibrations from affecting the accuracy of his weigh measurements. Pratt also began constructing his mix tank and slurry delivery system in December.

The January 12 prototype had all of the components of the ingredient mixing and slurry delivery systems that are covered by the "mixing" claims of the patent. Mr. Pratt testified that the January 12 system also cumulatively weighed ingredients, and it is apparent that the January 12 machine contained all of the elements disclosed in the "cumulative" weigh claims. In addition, the January 12 machine contained some isolation means, and Mr. Pratt's notes indicate that he was already planning the addition of other isolation means such as panels and stabilizer bars. The Court finds that, at the time Mr. Pratt offered his weigh machines to the Sunbelt Feedlot, he had already built one prototype and was engaged in constructing the January 12 prototype.

Although the evidence was disputed below and on appeal, these factual findings are not clearly erroneous, nor has this court so found them.

Relying on these facts, and not just those that are undisputed, the district court formed a legal conclusion that the totality of circumstances manifests the existence of an on sale bar within the meaning of section 102(b). The district court also held that Micro had not countered defendants' showing. While these facts suggest that the apparatus offered on December 26, 1984, was something less than both the reduction to practice that occurred some two weeks later and the final form of the invention as installed in March, our cases as well as the singularly important underlying policy of preventing inventors from extending the patent term each require that we affirm the existence of an invalidating offer for sale. The addition of elements improving the invention after the attempted commercialization does not trump the district court's separate factual findings: Pratt attempted to commercially exploit an apparatus by offering it to Isaac in December 1984, and the offered apparatus included either every element claimed in the '971 patent or the necessary suggestion to combine the offered elements with prior art, such as existing isolation means, to render obvious any remaining elements.

Micro's arguments on appeal amount to a request that we reverse the holding of an on sale bar because several features of the patented invention were not fully embodied in, or obvious in light of, the apparatus offered for sale to Isaac in December 1984.* Specifi-

---

* The district court stated that Micro failed to direct the court "to elements of the claims not fully embodied in, or obvious in light of, the January 12, 1985" ... prototype. The relevant inquiry is what was being offered for sale to Isaac, not whether the January 1985 prototype was substantially the same as the claimed invention. However, this error is harmless.

cally, Micro argues that Pratt had not completed, substantially completed or come close to completing his invention, he was not confident that the invention was "highly likely" to work for its intended purpose, and the invention was not commercially marketable at the time of his offer to Isaac. To support this court's reversal on section 102(b), Micro offers evidence of the development process of Pratt's apparatus, his trial testimony, and requests that we compare the patent claims to the apparatus that Pratt claims existed at the time of the offer.

Micro's evidence and arguments were submitted to the district court, which considered and rejected them during a trial of more than two weeks during which it made credibility determinations that are virtually unreviewable by this court. Moreover, Pratt's testimony about his subjective intentions is unhelpful. *See, e.g., TP Lab., Inc. v. Professional Positioners, Inc.,* 724 F.2d 965, 972, 220 USPQ 577, 583 (Fed.Cir.1984) (in the context of considering objective indicia of experimentation, "the expression by an inventor of his subjective intent ... particularly after institution of litigation, is generally of minimal value.") The district court found that Pratt's offer to Isaac added most elements of his '971 patent to the prior art, and this addition rendered obvious all additional elements found in the patent. I see no error. We should refrain from reversing a section 102(b) determination using the secret, subjective and self-interested beliefs of an inventor.