**EVANS COOLING SYSTEMS, INC. and Patent Enforcement Fund, Inc., Plaintiffs–Appellants,**

v.

**GENERAL MOTORS CORP., Defendant–Appellee.**

**No. 97–1146.**

United States Court of Appeals, Federal Circuit.

Sept. 16, 1997.

---

Karl R. Fink, Fitch, Even, Tabin & Flannery, Chicago, IL, argued, for Plaintiffs–Appellants. With him on the brief was John F. Flannery.

Jonathan F. Putnam, Kirkland & Ellis, New York City, argued for Defendant–Appellee. With him on the brief were Robert G. Krupka and David S. Brafman.

Before ARCHER, Chief Judge, MICHEL and LOURIE, Circuit Judges.

MICHEL, Circuit Judge.

Evans Cooling Systems, Inc. and Patent Enforcement Fund, Inc. (collectively, "Evans") appeal the September 30, 1996 order of the United States District Court for the District of Connecticut granting summary judgment to General Motors Corporation ("GM") of invalidity based on the "on sale" bar under 35 U.S.C. § 102(b). The appeal was submitted for our decision after oral argument on July 1, 1997. Because there were no materially disputed questions of fact regarding whether the patented invention was offered for sale more than one year prior to the critical date and because we decline to create an exception to the on sale bar for those instances in which a third party misappropriates the invention and later places the invention on sale or causes an innocent third party to place the invention on sale, we affirm.

## BACKGROUND

United States Patent Number 5,255,636 ("the '636 patent") issued on October 26, 1993 and claims an aqueous reverse flow cooling system for internal combustion engines. An understanding of the technology is not necessary to this appeal and we therefore do not discuss it. John Evans, the named inventor, admits he conceived the patented invention in 1984 and reduced it to practice in 1986. Mr. Evans did not file a patent application, however, until July 1, 1992.

In early 1994, Evans filed the present lawsuit alleging that GM infringed the '636 patent by the manufacture and sale of cars having GM's "LT1" and "L99" engines. GM counterclaimed for a declaration of invalidity and non-infringement. GM asserted that the '636 patent was invalid because GM and its independent dealers had placed the patented invention on sale prior to the critical date with the introduction of its 1992 Corvette. Specifically, GM sent an "Order Guide" for the 1992 Corvette to its independent dealers in late April or early May, 1991 to be used for ordering the vehicle described in the Order Guide. At about the same time, GM sent its dealers a supplemental brochure that provided additional ordering information for the 1992 Corvette, specifically stating that the car had reverse flow engine cooling. A representative of GM testified that it expected the dealers would start ordering the vehicles as soon as the Order Guide was sent to them. A sales representative at a GM dealership also testified that it was the dealership's common practice to order new cars and enter into agreements to sell new cars shortly after receiving the Guide. GM produced computer records documenting over 2000 orders placed by dealers around the country for the 1992 Corvette before the critical date. The orders, over 300 of which were placed on behalf of specific retail customers, were placed through a computer network and GM transmitted an acknowledgment back to the dealer after receiving the order. As a specific example, GM introduced evidence regarding a retail customer named Aram Najarian who visited a Corvette dealer in West Bloomfield, Michigan, in June, 1991. Mr. Najarian entered into a contract with a GM dealer on June 13, 1991 in which GM agreed to sell and Mr. Najarian agreed to buy a Corvette with an LT1 engine. Although a firm price was not established at that time, Mr. Najarian was informed that the price would be up to $2000 higher than the 1991 model and he placed a deposit on the car at that time. The order was transmitted to GM, and GM sent back an acknowledgment on June 14, 1991.

Evans asserted before the trial court that GM should not be allowed to invalidate the '636 patent because GM, in fact, stole the invention from Evans. Specifically, GM allegedly requested that Evans demonstrate its aqueous reverse flow cooling system at GM's test facility in the spring of 1989, and Evans alleges that GM stole the invention during this demonstration.

The district court granted summary judgment in favor of GM on September 30, 1996, because the record established that GM and its dealers placed the 1992 Corvette with the LT1 engine on sale prior to the critical date. The district court relied on the facts that Mr. Najarian entered into a contract with a GM dealer, the dealer agreed to sell and Mr. Najarian agreed to buy a 1992 Corvette, and Mr. Najarian paid a deposit and the dealer transmitted the order to GM. The court also noted that even an offer to sell will raise the on sale bar and that this transaction went beyond mere indefinite discussions about a possible sale. Turning to the policies underlying the on sale bar, the district court noted that John Evans claimed he reduced the invention to practice in 1986 but failed to file an application for some six years.

## DISCUSSION

We review the district court's grant of summary judgment de novo. *Petrolite Corp. v. Baker Hughes, Inc.*, 96 F.3d 1423, 1425, 40 USPQ2d 1201, 1203 (Fed.Cir.1996). A person is not entitled to a patent if "the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b) (1994). In order for a patent to be invalid under this statute, the claimed invention asserted to have been on sale must be substantially completed with reason to expect it would work for its intended purpose, *Micro Chem., Inc. v. Great Plains Chem. Co.*, 103 F.3d 1538, 1545, 41 USPQ2d 1238, 1244 (Fed.Cir.1997), must have been embodied in or obvious from the device offered for sale, and the sale must have been primarily for profit, *id.* at 1544, 103 F.3d 1538, 41 USPQ2d at 1243; *Key-Stone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1451, 27 USPQ2d 1297, 1303 (Fed.Cir.1993). Whether an invention was placed on sale prior to the critical date is ultimately a conclusion of law that we review de novo, although it is based on underlying

facts. *Micro Chem.*, 103 F.3d at 1544, 41 USPQ2d at 1249; *Ferag AG v. Quipp, Inc.*, 45 F.3d 1562, 1566, 33 USPQ2d 1512, 1514–15 (Fed.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 71, 133 L.Ed.2d 31 (1995).

## I.

■ GM argues, and the trial court held, that the '636 patent is invalid because the independent dealers placed the accused engine on sale to retail customers. As discussed more fully in the fact section, this argument involves the contract for sale entered into on June 13, 1991 between Mr. Najarian and Jack Cauley Chevrolet, Inc., which had received the 1992 Corvette Order Guide and a brochure containing ordering information for the 1992 Corvette and the LT1 engine around April 30, 1991.

Evans makes no argument that the LT1 engine in the 1992 Corvette was not substantially complete. Nor does Evans argue that the pre-critical date sales were for a noncommercial purpose.

■ Evans does, however, argue that summary judgment was inappropriate because GM did not meet its burden of proving by clear and convincing evidence that the engine of the 1992 Corvette anticipated the claims of the '636 patent. Although GM conceded infringement for purposes of the summary judgment motion, it denied infringement in its answer and stated in sworn answers to interrogatories that the claims of the '636 patent were not infringed because the LT1 engine lacked certain elements of the claims. Evans argues, therefore, that GM has necessarily admitted, or at least created a genuine issue of material fact, that the engine of the 1992 Corvette does not anticipate any of the asserted claims.

We do not agree. This is not the typical case where the patentee has placed some device on sale prior to the critical date and the accused infringer must demonstrate that this device actually embodied or rendered obvious the patented invention. Here, the entire basis of the lawsuit is Evans'—the patentee's—contention that the LT1 engine—the device that was put on sale—contains a cooling system that infringes. GM denied that the LT1 engine infringed the '636 patent but, by conceding infringement for purposes of the summary judgment motion and its on sale defense, properly pled in the alternative. *See* Fed.R.Civ.P. 8(e) (1997) ("A party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses."). Although GM bore the burden of proving that the LT1 engine embodied the patented invention or rendered it obvious for purposes of the summary judgment motion, this burden is met by Evans' allegation, forming the sole basis for the complaint, that the LT1 engine infringes. Indeed, even on appeal, Evans states in its brief, directed only to the on sale issue, that "GM uses an aqueous reverse flow cooling system in its LT1 engine."

Evans also argues, in effect, that there was no "sale" or offer for sale of the LT1 engine. Evans argues that, based on the totality of the circumstances, a reasonable jury could conclude that "the Najarian 'order' was an advance, non-binding order, cancelable by either party, that was not finalized until after July 1, 1991" and that it was void to the extent that it was an offer for sale. We have often stated that the totality of the circumstances and the policies underlying the bar must be considered in determining whether a definite offer for sale triggering section 102(b) has been made. *See, e.g., Envirotech Corp. v. Westech Eng'g Inc.*, 904 F.2d 1571, 1574, 15 USPQ2d 1230, 1232 (Fed.Cir.1990). However, where there is a specific and definite offer for sale of a successfully tested device, such as that evidenced by a completed contract for sale, that embodies every limitation of the later patented invention as claimed prior to the critical date and that sale is clearly for commercial purposes, the analysis need not go any further. It is not that the totality of the circumstances test is not to be applied in such a case, but that there are then no circumstances, short of fraud or duress, that could turn such an offer into something other than a barring event.

Even if we were otherwise to consider the totality of the circumstances, Evans' relevant arguments on this point are easily discarded. Evans argues that Mr. Najarian's order is ineffective as a sale because it stated that "[a]ny provisions of this order prohibited by

Michigan or Federal law shall be ineffective to the extent of such prohibition" and the Federal Fuel Economy Regulations and the Clean Air Act prohibited any offer for sale as of this date because GM had not yet received fuel economy labels or a Certificate of Conformity from the EPA. Even assuming this to be the case, the mere fact that the offer for sale was illegal or ineffective does not remove it from the purview of the section 102(b) bar. Jack Cauley Chevrolet thought it was offering to sell a 1992 Corvette to Mr. Najarian and Mr. Najarian thought he was agreeing to buy such a car. Moreover, there is no evidence that Mr. Najarian did not receive the car or that the offer was actually invalidated. Likewise, neither the fact that the price was not firm nor that the color had not been chosen avoids the section 102(b) bar. Mr. Najarian was given an estimated price range and it is not uncommon for car buyers to change their minds about the desired color. Similarly, the fact that the contract was cancelable or changeable under certain circumstances does not mean that it does not evidence a definite offer for sale. Finally, even if the independent dealership violated internal procedures by offering the 1992 Corvette for sale prior to the model announcement date GM had set, this does not make the offer for sale any less an offer.

Thus, we hold that the order entered into by Mr. Najarian and Jack Cauley Chevrolet on June 13, 1991—nearly a month prior to the critical date—evidences an effective offer for sale that invalidates the '636 patent. Although GM also argues that the '636 patent is invalid because GM placed the reverse flow cooling system in its engines on sale when it sent the Order Guide and supplemental information brochure to its dealers across the country in late April or early May of 1991, we do not reach or decide that issue here. *See Intel Corp. v. International Trade Comm'n,* 946 F.2d 821, 829, 20 USPQ2d 1161, 1169 (Fed.Cir.1991) ("A single sale or offer to sell is enough to bar patentability.").

## II.

■ Although our analysis would normally be complete once we had concluded there was an invalidating offer for sale, Evans urges this court to create a new exception to the on sale bar. Specifically, Evans asks us

to rule that an otherwise invalidating offer for sale does not invalidate a patent "where a third party surreptitiously steals an invention while it is a trade secret and then, unbeknownst to the inventor, allegedly puts the invention on sale [more than one year] before the inventor files a patent application covering the stolen invention."

Evans cites three Supreme Court cases and asserts that they state that prior use of an invention by one who misappropriates the invention cannot invalidate a patent. *See Pennock v. Dialogue,* 27 U.S. (2 Pet.) 1, 19–20, 7 L.Ed. 327 (1829) ("[I]f before his application for a patent his invention should be pirated by another, or used without his consent; it can scarcely be supposed, that the legislature had within its contemplation such knowledge or use.... The use here referred to has always been understood to be a public use, and not a private or surreptitious use in fraud of the inventor."); *Shaw v. Cooper,* 32 U.S. (7 Pet.) 292, 319–20, 8 L.Ed. 689 (1833) ("But there may be cases, in which a knowledge of the invention may be surreptitiously obtained, and communicated to the public, that do not affect the right of the inventor.... If the right were asserted by him who fraudulently obtained it, perhaps no lapse of time could give it validity."); *Kendall v. Winsor,* 62 U.S. (21 How.) 322, 329, 16 L.Ed. 165 (1859) (affording immunity from suit to prior third party users of a patented invention but refusing to extend such immunity to those who received knowledge of the patented invention through fraud). Evans argues that these Supreme Court cases have never been expressly overruled and, in fact, the one time the Court of Customs and Patent Appeals addressed the issue it expressly left it open, stating:

We do not find it here necessary to decide whether a fraudulent use of an invention for more than two years [then the bar period] prior to an application for a patent therefor bars the issue of the patent upon such application.... It may be that ... said Minerals Separation should have been held to be estopped to bring a public use proceeding. But even so, as to this we express no opinion....

*In re Martin,* 22 C.C.P.A. 891, 74 F.2d 951, 955–56 (CCPA 1935).

We, however, do not find any of these cases dispositive of the issue presented by this case. In *Pennock,* the Supreme Court actually invalidated the patents in suit under the public use bar, and in that case the use had been with the permission of the patentee, thereby rendering any statements regarding piracy mere dicta. Likewise, the statements relied on by Evans in *Shaw* are dicta, as there too the patent was invalidated because the innocent public had come to know and use the invention, although there was some evidence that the invention had first become known to the public by fraudulent means. The statutory on sale bar wasn't even in issue in *Kendall.* Rather, the issue was whether the defendant had the right to continue to use the invention after the patent issued. *See also Eastman v. City of N.Y.,* 134 F. 844, 852–55 (2d Cir.1904) (discussing whether "fraudulent, surreptitious, or piratical" use of an invention could raise the public use bar and rejecting statements in above Supreme Court cases as dicta).

We note as well that the one other court that has addressed this precise issue has rejected arguments similar to Evans' arguments. *See Lorenz v. Colgate–Palmolive–Peet Co.,* 167 F.2d 423, 77 USPQ 138 (3d Cir.1948). There, the court addressed the following question: "Was it the intention of Congress that public use by one who employs a process in breach of a fiduciary relationship, who tortiously appropriates it or who pirates it, should bar the inventor from the fruits of his monopoly?" 167 F.2d at 426, 77 USPQ at 141. Lorenz had disclosed his invention to Colgate. Although Colgate told Lorenz the idea was rejected, it later made substantial commercial use of Lorenz's invention and then sought to invalidate Lorenz's patent based on this use. *Id.* at 424–25, 167 F.2d 423, 77 USPQ at 140–41. After reviewing the Supreme Court and other relevant case law, the court rejected an exception to the statutory bar, stating:

> The prior-public-use proviso … contains no qualification or exception which limits the nature of the public use. We think that Congress intended that if an inventor does not protect his discovery by an application for a patent within the period pre-

scribed by the Act, and an intervening public use arises from any source whatsoever, the inventor must be barred from a patent or from the fruits of his monopoly, if a patent has issued to him. There is not a single word in the statute which would tend to put an inventor, whose disclosures have been pirated, in any different position from one who has permitted the use of his process…. [I]solated instances of injustice may result if the law be strictly applied, but the inventor's remedy is sure. He is master of the situation and by prompt action [in filing a patent application] can protect himself fully and render the defense of prior public use impossible.

*Id.* at 429–30, 77 USPQ at 144 (footnote omitted). Although this decision is not binding on this court, it is persuasive.

Even if we were to create an exception to the on sale bar such that third parties accused of misappropriating an invention could not invalidate a patent based upon sales by the guilty third party, GM correctly asserts that *Martin* squarely holds that activities of third parties uninvolved in the alleged misappropriation raise the statutory bar, even if those activities are instigated by the one who allegedly misappropriated the invention. In *Martin,* Martin's employer stole Martin's invention and filed an application on it and disclosed it to a third party. 74 F.2d at 952–53. After learning of his employer's activities, Martin filed his own application. After an interference was declared, the employer argued Martin's application was barred based on the activities of the third party. Martin conceded his invention had been in public use, but argued that the bar should not apply because the third party's use was "instigated by [his] employer and was a surreptitious and fraudulent public use against him" *Id.* at 953. After reviewing the Supreme Court and other relevant case law, the Court of Customs and Patent Appeals noted it had "been unable to find any authoritative decisions upon the question of whether a fraudulent public use of an invention … prior to the filing of an application …, or such public use of an invention instigated by fraud, bars the issuance of a patent…." *Id.* at 955. Although the Court of Customs and Patent Appeals did not address that precise

issue, the Court of Customs and Patent Appeals did hold that allowance of the application was barred because the third party's public use had been innocent, even though it had obtained the technology from the employer. *Id.*

As discussed below, this holding is dispositive here because, although Evans has charged GM with misappropriation, it has never contended that the independent dealers had any participation in or knowledge of the alleged theft; nor is there any indication that Mr. Najarian had such knowledge. Thus, the independent dealers are innocent users who put the invention on sale by placing orders for innocent retail customers like Najarian.

While such a result may not seem fair, Evans is not without recourse if GM in fact misappropriated his invention. Evans would have an appropriate remedy in state court for misappropriation of a trade secret. We note as well that the facts Evans alleges in support of its misappropriation claim demonstrate that Evans knew GM stole the invention at the very time it was allegedly stolen because during the demonstration GM employees allegedly told Mr. Evans they intended to steal the invention and a sealed room was unsealed during the night between the tests. Evans' patent rights would have nevertheless been protected if Mr. Evans had filed a patent application no more than one year from the date of the demonstration. This he did not do; instead Mr. Evans waited for more than two years after the demonstration and some six years after it was reduced to practice.

### CONCLUSION

The '636 patent is invalid due to the pre-critical date contract entered into between the independent GM dealership and Mr. Najarian whereby the dealership offered to sell and Mr. Najarian agreed to buy a 1992 Corvette containing the LT1 engine. Even if GM misappropriated the idea behind the LT1 engine cooling system from Mr. Evans, the invention was nevertheless on sale and we decline to create the suggested new exception to the 102(b) bar which has no basis in

the language of the statute. The trial court's decision is therefore affirmed.

*AFFIRMED.*