**LINEAR TECHNOLOGY CORP., Plaintiff,**

v.

**MICREL, INC., Defendant.**

**No. C–94–1633 MHP.**

United States District Court, N.D. California.

Aug. 19, 1999.

Norman H. Beamer, Fish & Neave, Palo Alto, CA, for Plaintiff.

Anthony de Alcuaz, Skjerven Morrill MacPherson Franklin & Friel LLP, San Jose, CA, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PATEL, Chief Judge.

On May 9, 1994, plaintiff Linear Technology Corporation brought this action against defendant Micrel, Inc., alleging that the MIC 2172 and MIC 3172 products infringed United States Patent No. 4,775,-741 ("'741 patent") and Reexamination Certificate B1 4,755,741. This action was originally assigned to United States District Court Judge Eugene F. Lynch. Judge Lynch denied Micrel's motion for summary judgment on whether the '741 patent is invalid due to an on-sale bar pursuant to 35 U.S.C. section 102. *See* Order dated February 26, 1997. In the same order, Judge Lynch bifurcated this action for trial on the issue of whether the '741 patent is invalid due to an on-sale bar, and stayed all other issues for later discovery and trial. *See id.* at 2. On July 15, 1997, the action was reassigned to this court. The court conducted a bench trial on the limited issue of whether the '741 patent is invalid due to an on-sale bar.

Having considered the testimony presented at trial and the other evidence submitted by the parties, the court FINDS for defendant Micrel and enters the following findings of fact and conclusions of law in accordance with its obligations under Federal Rule of Civil Procedure 52(c). Fed. R.Civ.P. 52(c) (requiring judgment under Rule 52(c) to be supported by findings of fact and conclusions of law).

### FINDINGS OF FACT

#### I. The Parties

1. Plaintiff Linear Technology Corporation ("LTC") is a corporation organized and existing under the laws of the State of California and having a principal place of business in Milpitas, California. Jt. Pretrial Conf. Stmt., at 3 ¶ 1.

2. Defendant Micrel, Inc. ("Micrel") is a corporation organized and existing under the laws of the State of California having its principal place of business in San Jose, California. Jt. Pretrial Conf. Stmt., at 3 ¶ 2.

#### II. Development Of '741 Patent And LT1070

3. The patent at issue in this case is United States Patent No. 4,755,741 ("'741 patent"), entitled "Adaptive Transistor Drive Circuit," as amended by Reexamination Certificates B1 4,755,741 and B2 4,755,741. The named inventor is Carl Nelson and LTC is the assignee of all right, title and interest in the '741 patent. Def.Exh. A–33; Nelson Testimony, 192:25–193:1.

4. Carl Nelson has been employed at LTC since 1981 as a Bipolar Design Manager. Nelson Testimony, 136:3–21. Among his primary duties are designing chips for LTC and the supervision of the design of chips. Nelson Testimony, 136:3–21. Nelson has been designing chips for about twenty-eight years and, during this time, he has been the named inventor on approximately twenty-five patents. Nelson Testimony, 193:1–8. Although not an

employee of LTC's marketing department, Nelson assisted the training of salespersons on the types of applications for which LTC's products can be used. Nelson Testimony, 193:1–8.

5. The application that resulted in the '741 patent was filed on November 18, 1986. Def.Exh. A–33.

6. The '741 patent originally issued on July 5, 1988. The first reexamination certificate issued on May 14, 1991, following a request for reexamination filed by a third party on June 1, 1990. The second reexamination certificate issued on December 26, 1995, following additional requests for reexamination filed by a third party and by Micrel on April 28, 1994 and September 9, 1994, respectively. Pl.Exhs. 1–3.

7. The '741 patent discloses an "adaptive transistor drive circuit." Def. Exh. A–33 at 1:5–21. The adaptive transistor drive circuit disclosed in the '741 patent describes "switching regulator circuitry" used to provide regulated voltages or currents. Nelson Testimony, 143:1–2.

8. The LT1070 chip manufactured by LTC is a switching voltage regulator invented by Nelson and embodies an aspect of every claim contained in the '741 patent, except for claims 2 and 12. Nelson Testimony, 139:20–141:18; 199:20–200:17. However, the LT1070 switching regulator circuit embodies the inventions claimed in all of the claims of the '741 patent that LTC asserts are infringed by Micrel. Jt. Pretrial Conf. Stmt. at ¶ 7. The LT1070 silicon chip initially constructed and tested by Nelson was essentially a functioning version of the '741 patent. Nelson Testimony, at 142:18–25.

9. In essence, the '741 patent "grew out" of Nelson's development of the LT1070 chip. Nelson Testimony, 139:17–19. Figure 5 of the '741 patent illustrates how the invention is used in the LT1070. Nelson Testimony, 198:11–17.

10. Nelson originally designed the LT1070 on paper, but later converted the design as envisioned on paper into silicon or chip form in approximately April, 1985. Nelson Testimony, 142:1–20. In an entry dated April 18, 1985, Nelson noted in his workbook that the "silicon looks good," indicating that the chip functioned well enough to run tests on it to determine whether any problems or abnormalities existed in the silicon. Nelson Testimony, at 142:11–17; Def.Exh. A–31, at LIN 01299. At that stage, Nelson was confident that the LT1070 could eventually be made to work, although he remained uncertain as to whether it would meet all the initial design goals. Nelson Testimony, 212:4–16.

11. Although the LT1070 chip performed "basically" as Nelson had intended it to, he identified an extensive list of problems with the LT1070 chip which had to be "work[ed] out" before it would be fully functional. Nelson Testimony, 194:18–21; Def.Exh. A–31, at LIN 01299. Because of these problems, the LT1070 was not sufficiently "functional enough" to be ready for manufacture. Nelson Testimony, 194:22–195:1. Nelson later made a first "round" of "fixes" to the LT1070 chip. Def.Exh. A–31, at LIN 01311–01314.

12. Despite having constructed a LT1070 chip which was essentially functional, Nelson discovered additional problems with the LT1070 in early November 1985, including a low oscillator frequency, an overlong "delay in the current sense comparator," a "leakage problem in the power transistor," and other "small adjustments." Nelson Testimony, 194:3–196:16; Def.Exh. A–31 at LIN 01331 and 0334. These problems caused delays in the release of the LT1070 to production. Nelson Testimony, 197:12–14.

13. On November 11, 1985, Nelson recorded methods for fixing these problems in the LT1070 in his engineering notebook. Def.Exh. A–31 at LIN 0134; Nelson Testimony, 195:12–197:11. Once these problems were resolved, LTC issued a Release Product Listing ("RPL") for the LT1070 on November 18, 1985. The RPL essentially released the product into LTC's

product line. Nelson Testimony, 198:1–7; Def.Exh. A–34.

14. Although Nelson testified that the LT1070 was not ready for manufacturing until well into 1986, LTC "does not dispute that the invention of the '741 patent was reduced to practice before November 18, 1985." LTC's Post–Trial Prop. Findings of Fact and Concl. of Law, at ¶ 29.

III. *Efforts To Sell And Sales*

A. *LTC's Sales Organizational Structure*

15. In 1985, LTC's sales force primarily consisted of independent sales representatives and distributors. Zapf Testimony, 241:7–242:19 (international distributors); Scott Testimony, 447:9–20 (sales force included domestic sales representatives and distributors). LTC's distributors purchased devices from LTC and resold the devices to end-user customers. Zapf Testimony, 241:20–25.

16. In 1985, LTC employed four Area Sales Managers in the United States and two in Europe. Exh. 201; Zapf Testimony, 242:11–25; 336:2–13. The Area Sales Managers were responsible for managing LTC's sales efforts within their sales territories. Zapf Testimony, 242:17–25. LTC's Area Sales Managers in Europe were Tom Lane and Andreas Meinelt, both of whom reported directly to Zapf. Zapf Testimony, 242:11–25.

17. In 1985, LTC's domestic sales network included twenty-two independent sales representative firms divided into four geographic territories and sixteen independent distributor firms. Pl.Exhs. 55 & 202.

18. In 1985, LTC also had a network of international distributors, acting as both LTC's sales representatives and distributors for LTC's products. Zapf Testimony, 241:7–19. These distributors included Svensk, Jermyn, Amitron, Stolz, Bacher, Neye, Henskes, Success Electric and Eltron. Zapf Testimony, 243:5–244:8.

19. Each of LTC's international distributors had a written distributorship agreement with LTC, containing substantially the same terms as in Exhibit A–70. Zapf Testimony, 267:3–12. Those agreements provided that the contracts were governed by California law. Zapf Testimony, 267:22–268:7; Def.Exh. A–70 at LIN 16445 ¶ 10.1. The written distributor agreements also provided that the distributors take title to the goods FOB LTC's plant or nearest warehouse duty unpaid, referring to LTC's plant in Milpitas where LTC manufactured its products. Zapf Testimony, 268:8–17; Def.Exh. A–70 at paragraph 4.3, LIN 16437.

20. LTC's international distributors purchased products from LTC and resold those products to their own customers in their territories. Zapf Testimony, 241:20–25. To purchase the products, the distributors sent their orders to LTC in California by telex. Zapf Testimony, 260:18–24. LTC received these orders at its plant in Milpitas, California. Zapf Testimony, 260:25–261:2. LTC accepted those orders in Milpitas and entered the orders into LTC's bookings system in Milpitas. Zapf Testimony, 261:3–8. Once the orders were entered into LTC's bookings system, acknowledgments were automatically generated by the system. Zapf Testimony, 261:9–13. Those acknowledgment forms were then sent back to the international distributors, acknowledging that the orders had been entered and booked by LTC. Zapf Testimony, 261:14–17. The international distributorship agreement provides that "all order for LINEAR Products from DISTRIBUTOR are subject to acceptance." Def.Exh. A–70, at LIN 16437 ¶ 4.4.

21. LTC's acknowledgments included an express provision that the purchaser is to take title to the goods in Milpitas, California. Def.Exh. A–74; Zapf Testimony, 261:21–262:25. Defendant's Exhibit A–74 is typical of the acknowledgment forms sent by LTC in 1985.

22. Invoices on shipments were issued by LTC from California. Zapf Testimony, 266:12–17.

B. *LTC's Data Sheets*

23. In 1985, LTC used product data sheets as one of its primary selling tools to provide information to potential customers about LTC's products in order to enable manufacturers to use LTC's component products in their own products. Nelson Testimony, 138:25–139:2; Def.Exh. A–32 [Nelson Decl.] at ¶ 7.

24. The LT1070 "preliminary" data sheet lists features of the LT1070 and provides technical information about the device, its applications, its electrical characteristics and its operation. Def.Exh. A–4 [LT1070 Preliminary Data Sheet]. The information is important to customers and was designed to grab the attention of customers and their engineers. Nelson Testimony, 163:8–25;164:13–166:12.

25. Nelson explained that a preliminary data sheet is intended to be an introduction of what the part does, but does not "typically" contain full information on certain particulars. Nelson Testimony, 215:13–22. The preliminary data sheet shows customers what the product will do so that if the customer is at a point in their design phase when they are trying to decide how to do a particular function, the customer can look at the preliminary data sheet and determine whether they think the device would work for them. Nelson Testimony, 215:23–216:6. If a customer determined that the device would have some applicability to their needs, it could request samples and "a real data sheet" from LTC. Nelson Testimony, 216:1–7; *see* Def.Exh. A–12 [March 1985 *Newsline* ], at LIN 06890.

26. Sales representative Mike Walters testified by deposition regarding the process he used to sell component products, such as those manufactured by LTC. In order to sell a product of a company like LTC, Walters stated that generally the approval of an employee in the purchasing company's engineering and purchasing departments was necessary. Walters Depo., 13:17–21. This process of getting a design engineer at a company to use a component product in one of the engineer's applications is known as a "design-in." Walters Depo., 14:10–20; 16:3–18; Stenstrom Testimony, 32:23–35:4.

27. Walters also testified that in the course of his business he sometimes used preliminary data sheets to generate interest in a customer for a part. Walters Depo., 40:4–13. According to Walters, a "preliminary data sheet" is "a data sheet with specifications on a part that says 'preliminary' some place on it, meaning that to the customer it's probably not in production and something might change." Walters Depo., 39:24–40:9.

28. Nelson wrote the preliminary LT1070 data sheet, drafting the text and drawings to be included. Nelson Testimony, 160:9–15; 166:16–167:3. LTC worked with an outside "art house" to prepare the proof sheet for the preliminary LT1070 data sheet. Nelson Testimony, 167:2–9; Williams Testimony, 115:9–15. The drafts of the preliminary data sheet were subject to a process of internal review, a process which could take as long as three or four months. Nelson Testimony, 168:2–14.

29. On October 14, 1985, LTC initiated a purchase order for the printing of 500 copies of the LT1070 data sheet by Globe Printing Company. Def.Exh. A–55 [Globe Data Sheet File], at p. G0013; Williams Testimony, 105:25–106:23. On October 21, 1985, LTC provided Globe with the artwork for the Preliminary LT1070 data sheet, along with a photocopy. Williams Testimony, 106:24–107:3; 107:22–108:19.

30. Globe was not responsible for preparing any of the text, diagrams, or layout of the LT1070 data sheet, other than masking out page numbers. Williams Testimony, 109:18–110:20. Globe simply took the original artwork as received from LTC and printed it in paper form. *Id.* Globe delivered 500 copies of the Preliminary LT1070 data sheet to LTC on October 25, 1985. Def.Exh. A–55 [Globe's Data Sheet File, Delivery Record] at p. G0007; Williams Testimony, 109:11–17.

C. *LT1070 Information Conveyed To Sales Force*

31. Robert Scott was LTC's Product Marketing Manager in 1985. Scott Testimony, 442:7–15. In the Spring of 1985, Scott informed LTC's independent sales representatives that a product named the LT1070, a switch mode control chip, would be coming out. Scott Testimony, 444:15–24. Scott anticipated that the sales representatives and international distributors would then talk with customers and familiarize themselves with companies that might use the LT1070. Scott Testimony, 445:10–16. At this point, LTC began its efforts to commercialize the inventions of the '741 patent embodied within the LT1070.

32. On July 21–23, 1985, LTC hosted a three-day sales conference at the Marriott Hotel in Santa Clara, California. Def.Exh. A–13; Zapf Testimony, 269:22–24. All LTC independent sales representatives and international distributors were urged to attend, and many did so. Zapf Testimony, 271:4–16; Def.Exh. A–13 [Sales Conference Binder at ¶ 5–7, listing attendees]; Def.Exh. A–19 [Declaration of Robert Scott at ¶ 4] (purpose of meeting was "to inform those attending of new and future LTC products, including . . . unannounced products which were still being developed but which were not yet available for sale"). The domestic sales representatives who attended the sales conference included Richard Beals and Dan Zenor of Gassner & Clark Co. Def.Exh. A–13 [Sales Conference Binder at ¶ 5–7, listing attendees]. The international distributors who attended included representatives from Neye, Svensk, Microlog, Henskes and Stolz. Def.Exh. A–13; Zapf Testimony, 271:13–16, 272:16–273:2.

33. Two of the presentations during the July 1985 sales conference discussed the LT1070: (1) a Voltage Regulators and References clinic, and (2) a Marketing clinic taught by Robert Scott. Def.Exh. A–20 [July 1985 Sales Conference Binder at LIN 07020] (listing Carl Nelson as the presenter at the VR & REF Clinic); Def. Exh. A–13 [Sales Conference Binder], at GC0030 and GC00137.

34. During the Voltage Regulators and References Clinic, an application circuit diagram was displayed to the attendees showing how the LT1070 could be used. Def.Exh. A–13 [Sales Conference Binder at GC0136–37]. Richard Beals, an independent sales representative, sketched the LT1070 application circuit into his copy of the sales conference binder. Beals Depo., 45:12–48:16. The international distributors also attended the Voltage Regulators and References clinic and received the same training at the session given to everyone else. Zapf Testimony, 275:20–276:7.

35. During a Marketing clinic, Robert Scott discussed the LT1070 as an upcoming product. He informed LTC's sales representatives and international distributors that LT1070 data sheets and samples were expected in the Fourth Quarter and that production quantities were expected by the First Quarter. Def.Exh. A–13 [Sales Conference Binder at GC 0030]; Scott Testimony, 447:14–25; 450:8–15.

36. Scott presented the information about the LT1070 so that the sales representatives and international distributors would identify and familiarize themselves with customers who might be able to use the LT1070. Scott Testimony, 448:1–4. The sales representatives and distributors were allowed and expected to discuss the LT1070 and its function with customers, and they were asked to explore possible applications for the LT1070. Scott Testimony, 448:9–18.

D. *Sales Representatives Promotion Of The LT1070*

1. *Samples*

37. Samples were provided free of charge to LTC's customers as part of LTC's Marketing program and were generally shipped out of LTC's finished goods inventory. Berry Testimony, 403:5–20.

Sample requests came from sales representatives and ordinarily identified the customer for whom the samples were intended as well as the anticipated future usage by the customer. Zapf Testimony, 247:17–23; 249:1–2, 10–19; 254:11–14. Along with data sheets, samples were among the primary means of introducing a product to customers. Walters Depo., 52:13–19. Customers could use samples to test whether a LT1070 "design-in" functioned properly. Walters Depo., 64:8–23.

38. Following the July 1985 sales conference, from July 17 to November 18, 1985, LTC received 26 separate requests for LT1070 samples from its domestic and international sales force, 25 of which identified the specific customer for whom the samples were intended. Def.Exh. A–79 [summary chart of sample requests]. Specifically:

(a) On July 17, 1985, domestic sales representative Tom Szwajkos ordered five LT1070s for customer Burroughs.

(b) On October 8, 1985, domestic sales representative Harvey King ordered three LT1070 samples for U.S. customer "HP." Foreign Area Sales Manager Tom Lane also ordered two LT1070 samples each for customers Racal, GEC AV/MAILSEA, Eurotherm and Datron.

(c) On October 17, 1985, domestic sales representative Nancy Lee ordered two LT1070 samples for customer "Sperry Mil."

(d) On October 25, 1985, foreign Area Sales Manager Tom Lane ordered two LT1070s samples customer Marconi. Def.Exh. A–6 [December 1985 Sample History].

(e) On October 28, 1985, domestic sales representative Bill Highsmith ordered two LT1070 samples for U.S. customer "DCA."

(f) On October 30, 1985, domestic sales representative Allan Horne placed two orders for two LT1070 samples for U.S. customers Wave–Tek and General Electric.

(g) On October 31, 1985, domestic sales representative Gino Skulick ordered two LT1070 samples for U.S. customer Bentley Nevada, and foreign sales representative Tony M. ordered two LT1070s for customer Instem.

(h) On November 5, 1985, domestic sales representative Mike Harrison placed two orders for two LT1070s for U.S. customer VG Systems.

(i) On November 6, 1985, domestic sales representative Steve Edwards ordered three LT1070 engineering samples for U.S. customer Harris Dracon.

(j) On November 8, 1985, foreign sales representative Schneider placed two orders for five LT1070s for customer Gittman.

(k) On November 11, 1985, domestic sales representative Bob Stenstrom ordered five LT1070 samples for Marshall Electric.

(l) On November 13, 1985, foreign sales representative Mundry ordered four LT1070s for customer Siemens and two LT1070s each for customers Becker, Schaffer and Deutronic.

(m) On November 14, 1985, foreign sales representative Bruno Donnou of Jermyn ordered two samples of two versions of the LT1070 for customer Visionor.

(n) On November 15, 1985, domestic sales representative Dan Zenor ordered five LT1070 engineering samples "for Dick Collins visit."

39. On November 15, 1985, LTC's Samples Coordinator, Derrick Berry, pulled the five LT1070 engineering samples for Dan Zenor and the three LT1070 engineering samples for Steve Edwards for customer Harris Dracon. Def.Exh. A–5 [November 1985 Sample History]; Berry Testimony, 423:3–424:20. Those engineer-

ing samples were sent to the sales representatives on November 21, 1985. Pl.Exh. 203.

40. In summary, LTC received 26 requests for a total of 71 LT1070 samples before the critical date. At least eight LT1070 samples were packaged for shipment before November 18, 1985, and were shipped to the sales representatives on November 21, 1985. Pl.Exh. 203.

### 2. *Other Commercial Promotion By Sales Representatives*

41. Richard Collins was LTC's Area Sales Manager for the Central Area in 1985. Collins Depo., 11:9–13; 13:13–14:6. Part of Collins' duties included selecting a sales representative firm to represent LTC in Minnesota. Collins looked for a representative firm that was knowledgeable about analog circuits, had a good relationship with the Linear Technology distributor, and had a good knowledge of the customer base. Collins Depo., 20:21–21:2; 21:7–17. Collins intentionally sought out smaller representative firms, with three to four salespeople, that were "hungry" in how aggressive they were in the marketplace. Collins Depo., 23:8–17. Collins selected Rockmore Sales Corporation ("Rockmore") to be LTC's independent sales representative in Minnesota for those reasons. Collins Depo., 23:20–25. Collins hired Rockmore in mid-summer, 1985. Collins Depo., 21:25–22:6; Stenstrom Testimony, 32:19–22.

42. John Moore was one of the three salesmen at Rockmore Sales Corporation. On September 26, 1985, he met with Ron Ebert, a design engineer at customer Sperry, and discussed the LT1070 with him. Ebert expressed interest in the LT1070, interest which Moore recorded in his notebook. Def.Exh. A–48 [Moore Notebook # 83], at RSC 0166; Moore Depo., 281:14–19. Moore gave Ebert a copy of what he called the Preliminary LT1070 "spec" at that meeting. Moore Depo., 189:10–190:1.

43. Thereafter, on September 30, 1985, Moore sent a letter to Ebert regarding LTC's products. Def.Exh. A–42; Moore Depo., 84:23–85:1. Moore enclosed a second copy of the literature regarding the LT1070, stating "I've also enclosed another copy of the *PRELIMINARY* LT1070 spec for your use." Def.Exh. A–42.

44. In his deposition, Moore testified that he believed the "spec" he referred to in his letter to Ebert was not the Preliminary LT1070 data sheet that is Defendant's Exhibit A–4. To his memory, the "spec" was a one-page, two-surface document with "preliminary" in diagonal in red. He also testified that he could not get his hands on any samples, specifications, or pricing for the LT1070. Moore Depo., 330:25–331:11. Moore candidly admitted, however, that he could be wrong about his recollection of the document he enclosed in his letter, and he volunteered that his memory "is not always the best thing in the world." Moore Depo., 285:14–21.

45. However, Moore used the term "spec" twice in his September 30, 1985 letter to Ebert, once in reference to the "Preliminary LT1070 spec" and once in reference to the "LT1038 twelve-page spec." Def.Exh. A–42. The 1986 Linear Data Book contains a copy of the twelve-page data sheet for the LT1038 and a copy of the preliminary data sheet for the LT1070. Def.Exh. A–65 at 3–53 & 10–14. That same LT1038 data sheet is referenced in Linear's *Newslines* in January and March 1985. Def.Exhs. A–11 and A–12. Based on this evidence, the court finds that Moore used the term "spec" in his September 30, 1985, letter to refer to the preliminary LT1070 data sheet. The court concludes that Moore enclosed a second copy of the Preliminary LT1070 data sheet, Def.Exh. A–4, in his September 30, 1985, letter to Ebert at Sperry.

46. Mike Walters, another Rockmore salesman, testified that he believed he and his colleagues at Rockmore had discussed the LT1070 with customers prior to No-

vember 18, 1985. Walters Depo., 85:24–86:9.

47. Robert Stenstrom was the third salesman working for Rockmore in 1985. Stenstrom specifically recalls the LT1070 and remembers that Richard Collins briefed the Rockmore salesmen on the LT1070 and the rest of LTC's product line early on in Rockmore's relationship with LTC. Stenstrom Testimony, 38:8–14; 39:1–3.

48. After Stenstrom learned of the LT1070, he actively promoted the LT1070 to his assigned accounts. Stenstrom Testimony, 39:17–40:1. Stenstrom testified that he promoted the LT1070 to Honeywell, Lake Center Industries, and to a number of other accounts throughout the territory. Stenstrom. Testimony, 39:17–24. He promoted the LT1070 to the customers in his territory by a number of direct visits with customers, and sometimes, although rarely, with written communications. Stenstrom explained that his style of selling the product was to visit with the customers directly and answer, as best he could, questions that they might have, and on the spot describe the product beyond what the data sheet might be able to do. Stenstrom Testimony, 43:8–15. Stenstrom further testified that he sent copies of the LT1070 data sheet to Bob Pearson, a design engineer at Honeywell, on or about October 1, 1985, and spoke with other Honeywell engineers at that time. Stenstrom Testimony, 44:8–19; 50:2–4. Additionally, Stenstrom testified that in September and October of 1985, he sent copies of the LT1070 data sheet to both Eben Ives and Dave Shonts, design engineers at Onan Corporation. Stenstrom. Testimony, 51:20–52:3; 54:3–9; 54:25–56:2.

49. By October 18, 1985, Stenstrom also was actively encouraging his colleagues to promote the LT1070 to their accounts. On that date, he wrote a memorandum to Mike Walters and John Moore stating:

WE REALLY *MUST* START BROADENING OUR ACCOUNT BASE *NOW*. THE LT1070 CAN BE SOLD *ANYWHERE*; BEST DAMNED POWER SUPPLY PART IN HISTORY.

. . .

THE LT1070 IS A PERFECT PART FOR RESIDENTIAL.

Def.Exh. A–47; Stenstrom Testimony, 59:17–63:16.

50. Dan Zenor of Gassner & Clark was also a LTC independent sales representative in 1985. Zenor testified by way of his deposition that he had met with Dave Conway, a design engineer at Norand, regarding the LT1070. Norand Corporation was one of the companies of which Zenor was aware that might have had a use for the LT1070. Zenor Depo., 112:10–14. While Zenor could not recall the specific details of the meeting, he testified that he had no reason to believe the meeting did not occur on approximately November 1, 1985. Zenor Depo., 109:7–110:8. Although Zenor did not specifically recall asking Conway to "design in" the LT1070 prior to November 1, 1985, he confirmed that he did seek a design-in for the LT1070 after that date. Zenor Depo., 112:15–113:9.

51. David Conway also testified, by deposition, about his meeting with Zenor regarding the LT1070 in the fall of 1985. Conway recalled meeting with Zenor and confirmed both that Zenor had discussed the LT1070 with him and that Conway had evaluated the device. Conway Depo., 32:5–22. However, Conway states that Zenor did not have any paper or other materials regarding the LT1070 with him when the two briefly discussed the device. Conway Depo., 32:1–33:1.

52. Collins, the LTC Area Sales Manager for the Central Area, testified that during this time frame, he sought to keep the sales representatives focused on selling product that they had available to them, because spending a great deal of time trying to sell an unreleased product was a waste of effort when LTC needed revenue.

Collins Depo., 105:15–24. Collins recalled that there were many times he had to focus the sales representatives in his territory to sell what they had. Collins Depo., 106:2–3. He confirmed that he had had such conversations with his sales representatives regarding the LT1070, although he could not put a specific time frame on those conversations. Collins Depo., 106:25–107:5. Collins confirmed that Rockmore was one of the representative firms that he felt had a tendency to "lose focus" on generating revenue immediately and that he had to try and keep them focussed on selling products that were available. Collins Depo., 148:8–13. Collins' testimony confirms that some of the sales representatives in his territory were promoting the LT1070 to their customers in 1985, before the product was officially available.

E. *LTC's Further Communications to the Sales Force*

53. On September 5, 1985, Scott, LTC's Product Marketing Manager, sent a telex to independent sales representative Dan Zenor, seeking assistance in determining a sales price for the LT1070. Def.Exh. A–21 [September 5 Scott Telex]. In the telex, Scott listed the functions and features of the LT1070 and asked Zenor to obtain price information from users. Def.Exh. A–10. After receiving the telex, Zenor listed design engineers for certain customers across the top of the page, and at the bottom of the page, someone wrote "$6–10." Zenor Depo., 83:8–90:16.

54. The description of the functions and features of the LT1070 in Scott's September 5 telex to Zenor is highly similar to the "Description" of the LT1070 in the Preliminary LT1070 data sheet. *Compare* Def.Exh. A–21 *with* Def.Exh. A–4. The features are listed in virtually the same order and convey substantively the same information. Nelson Testimony, 175:11–180:13. Scott confirmed that he obtained the information to include in his telex from the engineering department, probably from the same person or group that created the LT1070 data sheet. Scott Testimony, 459:4–7; 469:3–9.

55. On September 19, 1985, LTC's Director of International Sales, Hans Zapf, sent a telex from his office in California to LTC's European distributors regarding an electronics industry trade show to be held in Paris, the Salon des Composants. Def. Exh. A–75. Zapf encouraged the distributors to attend a product update presentation during which he would discuss the LT1070, which he described as "LTC's brand new switched mode power supply circuit which will be a true industry first." Def.Exh. A–75; Zapf Testimony, 281:17–282:20.

56. Zapf also discussed the LT1070 prior to the critical date in his Quarterly Newsletter to the international distributors which he prepared in, and sent from, California. Zapf Testimony, 269:5–17; 283:17–284:1.

57. On October 17, 1985, Zapf sent another telex from California to LTC's European distributors regarding the LT1070 and the upcoming trade show in Paris. Def.Exh. A–76. These distributors included Amitron, Success Electric, Bacher, Neye, and Stolz, each of whom later placed orders for LT1070s. In the telex, Zapf stated "[a]s I indicated in my quarterly newsletter, I will give a product update on Wednesday, November 6th, focusing on the switched capacitor filters and the exciting new LT1070 switch mode regulator which is a true industry first product." Def.Exh. A–76; Zapf Testimony, 282:21–284:1.

58. Zapf began making preparations to attend the Paris trade show, and arranged for a poster describing the features of the LT1070 and hundreds of copies of the Preliminary LT1070 data sheet to be sent to Paris for use during the show. Zapf Testimony, 277:16–278:4; 278:12–280:3 [poster] 327:11–14 [data sheet]. Zapf prepared several transparencies depicting the features of the LT1070 for use in promoting

the LT1070 to the distributors in Paris. He assembled the transparencies from materials given to him by Nelson. Zapf Testimony, 284:5–13; 285:7–12; Def.Exh. A–26 at Exh. C [transparencies attached to Zapf Declaration].

59. At this time, Zapf was under the full impression and expectation that the LT1070 would be released prior to the Paris show. Zapf Testimony, 281:2–8. That same expectation was shared by LTC's sales force. Zapf Testimony, 281:7–8

60. On or about November 1, 1985, LTC published and distributed its November 1985 *Newsline*. Scott Testimony, 491:20–22; Def.Exh. A–14 [November *Newsline*]. LTC's *Newslines* were distributed to all of LTC's domestic sales representatives and international distributors. Scott Testimony, 490:19–491:5. In that November *Newsline*, Scott provided a full column article highlighting the LT1070:

> Looking ahead there are three new products that many of you have been clamoring to get hold of: the LT1070, 5 Amp and the LT1071 2.5 Amp High Efficiency Switching Regulator and the LT1030, RS–232 Quad Line Driver.
>
> To sharpen your memory just a bit, the LT1070 promises to be a big hit at accounts facing the decision of whether to 'make or buy' their next power supply.... Carl Nelson's goal in designing the LT1070 series is to provide the user a high performance-easy-to-use-switching regulator requiring very few external components, at a very competitive cost compared to conventional power supply designs. Our first look at samples says the LT1070 series won't disappoint anyone.... Be on the watch next month for a full product bulletin including details on pricing, samples, production availability and media coverage introducing the LT1070 and LT1071.

Def.Exh. A–14 at LIN 15320.

61. Scott testified that his comment about samples was meant to communicate to the sales force that actual silicon LT1070 chips were available, had been looked at, and were functioning. Scott Testimony, 492:22–493:18.

62. The November *Newsline* also contained a "Linear Technology Product Design Help List" from LTC Vice President Bill Ehrsam. Scott Testimony, 493:23–494:5. LTC published the Help List to aid sales representatives whose customers experienced difficulties in using the listed devices. Def.Exh. A–14 at LIN 15318. LTC encouraged sales representatives to have their customers' engineers contact the LTC design engineer directly for assistance. Def.Exh. A–14. The list included the LT1070 and identified Nelson as the LT1070 designer. Scott Testimony, 494:22–25.

63. A few days later, on November 6, 1985, Scott sent a telex regarding the LT1070 to LTC's Area Sales Managers, including the two European sales managers, stating:

> AS YOU KNOW, WE HAVE A BIG PUSH SCHEDULED FOR THE LT1070 WITH MAGAZINE COVER STORY AND OTHER ARTICLES AND PRESS RELEASES BEGINNING IN EARLY DECEMBER.
>
> **SEVERAL REQUESTS FOR SAMPLES AND EVEN PRODUCTION ORDERS HAVE BEEN RECEIVED. WE HAVE LT1070CK SAMPLES BEING READIED FOR SHIPPING DURING THE NEXT WEEK.** THE QUANTITY IS LIMITED SO ADVISE THAT THEY BE USED CAREFULLY. LARGE QUANTITIES OF THE LT1070CK AND LT1070CT ARE ROUGHLY 6 WKS AWAY FROM SHIPMENT WHICH STILL ALLOWS ANSWERING OF REQUESTS AFTER THE DECEMBER RELEASE WITHIN A REASONABLE TIME. DURING THE NEXT 6/WKS, **WE ASK THAT YOU CAREFULLY SELECT THE CUSTOMERS YOU WANT TO GET THE SAMPLES WE**

HAVE IN STOCK AND LIMIT THE QUANTITIES. FROM A PERFORMANCE VIEWPOINT, THE 1070 LOOKS EXCELLENT. DON'T FORGET THE 1071, 3 AMP VERSION OF THE 1070. SEE NEWSLINE FOR NOVEMBER.

ORDERS FOR LT1070 CAN BE BOOKED HOWEVER IT WILL BE ABOUT 4 WKS BEFORE FORMAL SCHEDULES CAN BE ACKNOWLEDGED. CALL IN TO MARKETING FOR SPECIFIC DEALS WHERE YOU HAVE DESIGN–INS NEEDING PARTS SOONER THAN 4-6 WKS.

Def.Exh. A–10 [November 6 Scott Telex] (emphasis added).

64. Scott testified that his November 6, 1985 telex was in error when it said that "orders can be booked" because the product had not yet been released at that time. Scott Testimony, 497:3–6 and 629:13–23. Scott, however, did not testify that he withdrew the memorandum or informed the recipients that the memorandum was in error. Scott did not testify that the November 6 telex was erroneous in stating that sample requests and production orders had been received, that samples were being readied for shipment the following week, or that as of November 6, he expected the sales force might already have had customer design-ins needing LT1070s sooner than four to six weeks. *See* Scott Testimony, 496:11–497:20.

F. *Price Information*

65. LTC had an initial price range in mind when it began designing the LT1070. Zapf Testimony, 348:1–11. By September 5, 1985, LTC had a specific price range in mind for the LT1070 and solicited input from sales representatives to determine how much a user would be willing to pay for it. Def.Exh. A–21. By October 28, 1985, Scott had informed at least one LTC Area Sales Manager, Herb Wallack, of the anticipated pricing for the LT1070. On that date Wallack recorded the following his notebook:

LT1070 CK

| Dist. | 100–999 | 1K | 5K | 10K |
|---|---|---|---|---|
| 6.75 | 9.60 | 9.00 | 8.40 | 7.90 |

Def.Exh. A–58 [Wallack Notebook] at LIN 6848. Wallack testified in a declaration that these notes reflect a conversation he had with Scott, where Scott informed Wallack of the pricing for the LT1070. Def. Exh. A–71 at ¶¶ 8–11.

66. Wallack testified that in his 1985 notebook, he contemporaneously recorded information and thoughts about his business activities conducted on behalf of LTC. Def.Exh. A–71 at ¶ 3. He also explained that a substantial portion of the entries in his notebook reflect planning for meetings with distributors, sales representatives and customers. *Id.* Wallack further stated that he did not pass on the pricing information to any of LTC's sales representatives or distributors, but rather, the recorded pricing information lay the groundwork for "knowing what was coming in the future." Def.Exh. A–71 at ¶ 10.

67. On or about December 1, 1985, LTC published its December 1985 *Linear Newsline* which LTC contends first "announced" the LT1070 to the sales force. Def.Exh. A–57 [December *Newsline*]; Zapf Testimony, 349:18–350:17; Scott Testimony, 626:9–24. In an article entitled, "Introducing The LTC 1070 By LTC," LTC notified its employees that it is "pleased to announce the LT1070" and goes on to explain the "unique features" of the LT1070. Def.Exh. A–57 [December *Newsline*], at LIN 15333. The December *Newsline* also contains pricing information for the LT1070CT, specifically stating that "[p]rice in 100's for the LT1070CT (TO 220) is $7.45," and further notifies employees that "[p]reliminary data sheets are available now with the final data sheets due in February (Remember, this data sheet is HUGE!!)." *Id.* at LIN 15334. Moreover, although LTC points to the "pleased to announce" language in the December *Newsline*, that *Newsline* issue contains no express statement that the

LT1070 was a released product and that LTC's sales representatives could solicit orders for sale.

68. Although LTC issued a press release on the LT1070 on January 15, 1986, in which it published price information and stated that "sample quantities are available now; full production quantities will be available in February 1986," such information was available long before January 15, 1986. *See* Pl.Exh. 13.

69. Nonetheless, LTC's distributors did not need to know the prices of LTC's products before submitting purchase orders. Zapf Testimony, 346:17–347:13.

G. *LTC's Promotion of The LT1070 Directly To End–User Customers*

70. In September of 1985, LTC's Vice President of Design Engineering Robert Dobkin visited two LTC customers and discussed the LT1070 with them. Scott Testimony, 451:10–19; Def.Exh. A–19 [Scott Decl.] at ¶ 8. Although Scott testified that Dobkin did not discuss the specifics of the LT1070 during these two customer visits, Scott when questioned was unable to provide the court with any particulars as to how he had determined the nature or extent of Dobkin's discussions with the LTC customers regarding the LT1070. Scott Testimony, 451:4–452:19; Def.Exh. A–19 [Scott Decl.] at ¶ 8. Dobkin did not testify at trial and therefore did not deny or explain these events.

71. On approximately September 18, 1985, Carl Nelson met in New York with the editorial staff of *Electronic Design* magazine regarding a cover story featuring the LT1070, to be published in the December 26, 1985 edition. Def.Exh. A–58 [Wallack Notebook], at LIN 6807; Def. Exh. A–59 [Wallack Expense Report] (showing the 9/18/85 meeting with Nelson re: LT1070); Def.Exh. A–1 [December 26, 1985 *Electronic Design* Article]. Although Nelson could not remember the specific date of the meeting at trial, he did not dispute Wallack's notebook entry, and admitted that the meeting occurred several

months before the December 26, 1985 cover date. Nelson Testimony, 156:14–158:5. LTC did not present any evidence at trial to controvert this evidence. On December 5, 1985, LTC Vice President Bill Ehrsam instructed the Area Sales Managers to refrain from discussing the LT1070 with the press until the *Electronic Design* article was published because LTC and *Electronic Design* had entered into an "exclusivity commitment." Pl.Exh. 12.

72. Nelson testified that as part of his job he visited customers and gave seminars about LTC's products. Nelson Testimony, 137:14–138:6. In those seminars, he taught customers' engineers how to use LTC's chips so that the engineers would design LTC products into the customers' own products, and LTC would wind up selling chips. Nelson Testimony, 138:7–13.

73. Nelson confirmed that he has given seminars to customers on the LT1070 (Nelson Testimony, 138:16–18) and that he has traveled in New York with Wallack. Nelson Testimony, 152:15–19. Wallack's 1985 notebook contains two entries on a page between pages dated ⁹⁄₂₃ and 9/24: "1070 Monday" in close proximity to "Presentation/Nelson" and "Data General" in juxtaposition with "LT1070." Def.Exh. A–58 [Wallack Notebook] at LIN 06815, 06820 and 06828. Nelson did not recall one way or the other whether he made a presentation on the LT1070 to Data General in September 1985. Nelson Testimony, 150:13–18. Wallack, presently an LTC employee, did not testify or otherwise explain his notebook entries. *See* Zapf Testimony, 325:7–15. Despite the scattered and disjointed nature of Wallack's notebook entries, it is reasonable to read the two phrases in conjunction and conclude that Wallack's notes refer to a customer seminar on the LT1070 given by Nelson in September, 1985.

74. Nelson recalled being at the IBM Research Triangle facility to give a seminar on LTC products, but could not recall the date or whether he discussed the

LT1070. Nelson Testimony, 158:15–24; 159:22–25. Wallack's notebook contains the following entry dated 9/24:

IBM—Research △ Seminar
LT1014 Telcom
LT1052 etc. Communication
LT1070 Power

Def.Exh. A–58 [Wallack Notebook] at LIN 06828. Nelson did not recall one way or the other whether he gave a seminar, including the LT1070, in September, 1985, at IBM Research Triangle. Nelson Testimony, 159:18–21. Wallack did not explain his notebook entries through testimony procured by either party. Given Nelson's inability to provide the court with any particulars regarding any seminars given at IBM Research Triangle, it is reasonable to conclude that Wallack's notes refer to a customer presentation or seminar given by Nelson on the LT1070 at the IBM Research Triangle facility in September, 1985.

75. In October 1985, Carl Nelson gave Nello Sevastopoulos information relating to the LT1070, which Sevastopoulos then used to create viewgraphs to present to customers. Sevastopoulos Testimony, 357:15–358:12; 367:17–22; Def.Exh. A–3 [Sevastopoulos Decl.] at ¶¶ 3–4 & Exhs. A–1 to A–10. Although Sevastopoulos did not recall receiving a preliminary data sheet from Nelson, he did recall receiving the information on loose sheets of paper. Sevastopoulos Testimony, 358:5–12, 359:10–15. The information in the viewgraphs he prepared contained much of the information that was included in the LT1070 preliminary data sheet, including the Features, the Applications, the Block Diagram, the Maximum Power Output graph, and the Typical Application drawing. *See* Sevastopoulos Testimony, 361:6–367:16.

76. On October 29, 1985, Sevastopoulos visited customer Standard Radio in Sweden and discussed the LT1070 with several of its engineers. Def.Exh. A–3 [Sevastopoulos Decl.] at ¶¶ 5–7; Sevastopoulos Testimony, 371:15–372:15. During this visit, Sevastopoulos presented several of the viewgraphs he prepared from the materials he received from Carl Nelson. Def. Exh. A–3 [Sevastopoulos Decl.] at ¶¶ 5–7; Sevastopoulos Testimony, 371:15–372:15.

77. From November 4–8, 1985, LTC participated in the Salon des Composants electronics industry trade show in Paris. LTC displayed the poster of the LT1070; however, the shipment of copies of the LT1070 preliminary data sheet was lost in transit to the Paris trade show. Zapf Testimony, 326:23–327:10; 328:1–13, 342:9–17; Def.Exh. A–73 [LT1070 poster]. The poster included some of the same operation and application information that appears in the LT1070 data sheet. Zapf Testimony, 278:12–15, 279:1–15. Nothing on the poster indicated that the LT1070 was not yet available or that the LT1070 was an unreleased product. Def.Exh. A–73 [LT1070 poster]; Zapf Testimony, 279:23–25, 280:1–3. During the show, Sevastopoulos spoke with a trade show attendee about a specific application for the LT1070. Sevastopoulos Testimony, 377:25–378:10; Def.Exh. A–3 [Sevastopoulos Decl.] at ¶ 11.

78. Zapf also held a new product update meeting in Paris, France on November 6, 1985, which several foreign distributors and sales representatives attended. Zapf Testimony, 330:11–25. At this meeting, Zapf told the distributors about the LT1070, how to look for customers in Europe, what type of customers would use the LT1070, and about the key features of the LT1070. Zapf Testimony, 338:11–339:4. Zapf further testified that he told the attendees that the information regarding any unreleased products disclosed at the meeting was confidential. Zapf Testimony, 339:1–4. Zapf also testifies that although LTC employees' attending the Paris trade show were initially operating under the assumption that the LT1070 would be a released product they learned prior to the show that it would not be released. Zapf Testimony, 329:14–21. However, he does not remember how he learned that the LT1070 would not be

released prior to the trade show. Zapf Testimony, 329:14–21.

79. On November 11, 1985, Sevastopoulos visited Thorn–EMI, a customer in England, and discussed the LT1070 with several of its engineers. Def.Exh. A–3 [Sevastopoulos Decl.], at ¶ 13; Sevastopoulos Testimony, 378:11–379:8.

80. Although the Salon des Composants trade show and the presentations to Standard Radio and Thorn–EMI were not held within the United States, LTC's actions in promoting the LT1070 on those occasions in early November 1985 is contemporaneous evidence of LTC's actual sales practices with respect to the LT1070 prior to the critical date. In particular, these events establish that it was not against LTC's company practice to commercially promote the LT1070 to customers before the LT1070's "official release" on November 18, 1985.

81. From November 19–22, 1985, LTC attended the WESCON '85 electronics industry trade show in San Francisco and distributed copies of its 1986 Linear Databook. That data book included the Preliminary LT1070 data sheet. Def.Exh. A–65; Scott Testimony, 627:2–4, 19–25.

82. According to LTC, prior to the December *Newsline*, there was no announcement to the sales force that the LT1070 had been released or that it was officially available for sale. Zapf Testimony, 323:24–324:10. However, testimony revealing that LTC accepted orders for the LT1070 prior to December 1, 1985, casts significant doubt on LTC's claim that the December 1, 1985, issue of *Newsline* was the first time LTC informed its independent sales representatives and/or distributors that they could promote the LT1070 to end-user customers.

H. *Pre–Critical Date Receipt of Orders For LT1070s By LTC*

83. Serena Ann Lucey, a Customer Service Representative for LTC, testified that in 1985, LTC received purchase or-

ders from its customers, often by fax or telex. Lucey Testimony, 545:8–9. Each of those purchase orders contained "line items" identifying the specific products and quantities the customer desired to purchase. Lucey Testimony, 549:19–550:5.

84. In 1985, LTC sometimes received requests from customers for products that were about to be released but which had not yet been formally released by the company. Those orders could not be entered onto LTC's order entry system at the time they were received because the computer system did not accept entries for part numbers it did not recognize. Scott Testimony, 501:3–23; Lucey Testimony, 551:4–14. Part numbers were not added to the system library until the device was released.

85. When LTC received an order for a product that was not yet formally released, the Customer Service representative first checked with Marketing to determine the status of the product. Lucey Testimony, 571:19–572:25; 578:8–13. If the product was soon to be released, or expected to be released within the quarter, the Customer Service representative entered a notation into the bookings database for that order, listing "will advise" in the part number description column. *Id.* Typically, the "will advise" entries were also listed with a quantity of "1" because the bookings system required some quantity to be entered. Lucey Testimony, 566:1–4.

86. If the incoming order was for a product that was not expected to be released within 90 days, LTC would not have entered the "will advise" notation to track the order. Instead, LTC would have sent the order back to the customer. Lucey Testimony, 572:11–17; 572:21–573:3.

87. Acknowledgments for these "will advise" entries were issued automatically. Zapf Testimony, 315:3–316:13.

88. LTC kept track of the requests for which "will advise" notations had been made in the bookings system by placing the request on the Orders On Hold Re-

port. Lucey Testimony, 566:19–25. The Orders On Hold Report consisted of a ledger that the Customer Service person used to keep track of the orders. Lucey Testimony, 577:3–17.

89. The "will advise" entry could be deleted from the bookings system by entering the appropriate negative quantity for the same line item. Lucey Testimony, 567:7–10. Once the product was released and a product number was added to the computer system, the order could be formally booked as an order for the specific device on a new line item entry for that customer. Scott Testimony, 512:16–513:10. The product order could not be entered as the same line item as the line item previously occupied by a "will advise" entry, however, it had to be entered as a new line item. Scott Testimony, 514:6–515:5.

90. LTC received requests for LT1070s prior to November 18, 1985. Def.Exh. A–18 [Bookings Report excerpt]; Scott Testimony, 501:3–6; Zapf Testimony, 290:8–18. LTC could not enter those requests into the computer system because the LT1070 was not yet released and the part number was not yet in the computer system's library of part numbers. Scott Testimony, 501:3–502:1. Instead, LTC used "will advise" as an electronic marker or placeholder, to keep track of those orders for LT1070s. Scott Testimony, 501:3–502:1; Zapf Testimony, 314:15–17. Thus, once the paperwork cleared and the part number was entered into LTC's computerized bookings system, the orders could be booked as orders for the product. Zapf Testimony, 314:18–315:2.

91. For each of these "will advise" transactions, no further communication from the customer was required for LTC to process the order. Zapf Testimony, 317:7–11. LTC simply entered the order for LT1070s once the part number had been added to LTC's computerized data base. Zapf Testimony, 317:12–20. Thereafter, LTC shipped LT1070s to fill the orders. Zapf Testimony, 317:21–22.

92. LTC's Bookings Report, excerpted as Exhibit A–18 and summarized in Exhibit A–80, and the testimony of the witnesses at trial established that LTC received four separate requests for LT1070s from international purchasing distributors before November 18, 1985, which LTC tracked under its "will advise" procedure. *See* Def.Exh. A–80. Specifically:

(a) on or about October 31, 1985, LTC received an order from its international distributor Microlog for 50 LT1070s. LTC entered a "will advise" notation onto its bookings system on that date. LTC subsequently deleted the "will advise" entry and formally booked the Microlog order for 50 LT1070CTs on November 19, 1985. Def.Exh. A–18 at LIN 09674; Zapf Testimony, 305:11–307:3.

(b) LTC also received an order from its international distributor Neye for 50 LT1070s on or before November 6, 1985. LTC entered the order onto LTC's bookings system as a "will advise" entry, specifically listing the quantity as 50, and the price, $5.25. Thereafter, on November 19, 1985, LTC deleted the "will advise" notation and entered the order as an order for 50 LT1070s at the price of $5.25. Def.Exh. A–18 at LIN 09635–36, Zapf Testimony, 307:20–309:16.

(c) LTC also received an order for LT1070s from international distributor Bacher prior to November 18, 1985. LTC entered the transaction onto its bookings system under "will advise" on November 12, 1985, deleted the "will advise" entry on November 14, 1985, and entered Bacher's order for 100 LT1070s on November 19, 1985. Def.Exh. A–18 at LIN 19616, Zapf Testimony, 309:19–311:1.

(d) The fourth "will advise" transaction relating to LT1070s occurred with LTC's international distributor Svensk. Svensk placed orders for

three types of LT1070s, specifically 200 LT1070CKs, 300 LT1070CTs and 100 LT1070CHVTs. *See* Def. Exh. A–18. On November 11, 1985, LTC entered these transactions into the bookings system under three separate "will advise" entries with the quantity listed as "1" and with a price of zero. LTC later deleted those three Svensk "will advise" entries on November 14, 1985, using a "–1" quantity entry, and thereafter, LTC booked Svensk's orders for 200 LT1070CKs and 300 LT1070CTs on November 19, 1985, and LTC booked Svensk's third order for 100 LT1070CHVTs on November 21, 1985. Def.Exh. A–18, at LIN 09658; Zapf Testimony, 311:2–314:11; Scott Testimony, 519:2–521:12.

93. No communication was necessary from these customers for LTC to formally enter into the bookings system the orders for LT1070s that it had previously received and tracked as "will advise." Zapf Testimony, 324:21–24.

94. These "will advise" entries also appear in LTC's Sales Order Report. Def. Exh. A–17; Scott Testimony, 534:10–536:5. On the Sales Order Report, the column entitled "SO DT". stands for "Sales Order Date," and the column entitled "REQ DT" stands for "Request Date." Def.Exh. A–17; Scott Testimony, 536:10–23. The Sales Order Date is the date that the sales order entry was made, whereas the Request Date is the date on which a customer or distributor wanted to have the part delivered. Scott Testimony, 536:18–23. Finally, the Sales Order Report indicates the number of parts which remained "unshipped" at the time of the printout. Scott Testimony, 536:25–537:19.

95. LTC shipped the 200 LT1070CKs to Svensk on December 29, 1985. Scott Testimony, 619:9–20. This shipment, along with a shipment of 200 LT1070s to distributor Amitron on the same date, constituted the first shipments of LT1070s to purchasers. Scott Testimony, 618:10–619:20. The Bookings Report, Exhibit A–18, and the summary of the sales records, Exhibit 210, establish that this December 29, 1985 shipment to Svensk resulted from the same transaction and was part of the same purchase request that LTC originally noted as a "will advise" entry in its bookings system on November 11, 1985.

96. Additionally, LTC received another order for LT1070s prior to November 18, 1985. Specifically, LTC received an order for 50 LT1070s from distributor Jermyn on November 14, 1985. Def.Exh. A–19 [Scott Decl., at ¶ 11]. LTC did not use its "will advise" procedure for this order, however. LTC instead booked the order on November 19, 1985 and acknowledged the order on November 25, 1985. Def.Exh. A–74, Zapf Testimony, 261:18–262:1; 263:23–264:3.

## I. *LTC's Booking of LT1070 Orders Immediately After The Critical Date*

97. Separate and aside from these "will advise" transactions with Microlog, Svensk, Bacher and Neye, and the November 14, 1985 order from Jermyn, LTC also booked orders for nearly 1000 LT1070s in the few days immediately after the critical date. Specifically, on November 19, 1985, LTC booked Amitron's order for 200 LT1070CKs. Zapf Testimony, 321:25–322:2; Def.Exh. A–18 at LIN 09656. On November 20, 1985, LTC booked Henskes' orders for 50 LT1070CKs and 50 LT1070CTs. Zapf Testimony, 320:14–23; Def.Exh. A–18 at LIN 09638. Also on November 20, 1985, LTC booked Success Electric's order for 100 LT1070CTs. Zapf Testimony, 321:2–7; Def.Exh. A–18 at LIN 09640. On November 22, 1985, LTC booked Metronik's orders for 50 LT1070CKs and 100 LT1070CTs; LTC booked Eltron's orders for 100 LT1070CHVTs and 100 LT1070CTs; and, LTC booked Stolz's orders for 100 LT1070CTs and 100 LT1070CKs. Zapf Testimony, 320:4–13 [Metronik], 321:8–24 [Eltron] and 322:11–18 [Stolz]; Def.Exh.

A–18 at 09631 [Metronik], 09655 [Eltron], and 09661 [Stolz].

98. In the four days immediately following the critical date, LTC formally booked orders for more than 1,700 LT1070s. To the knowledge of Zapf, no announcement had been made to the sales force or the distributors to inform them that the LT1070 was released on November 18, 1985. Zapf Testimony, 323:24–324:10.

99. Along with the testimony provided during trial in connection with LTC's contention that it restricted access to technical information about the LT1070 prior to November 18, 1985, the court finds that from the fact and timing of the LT1070 bookings in the four days following the critical date that LTC had commercially promoted the LT1070 prior to November 18, 1985.

*CONCLUSIONS OF LAW*

1. The court has jurisdiction over this action pursuant to 28 U.S.C. section 1338(a). Venue is proper under 28 U.S.C. section 1400(b).

2. Although the court has attempted to avoid commingling findings of fact with conclusions of law, any conclusions that are inadvertently labeled as findings (or *vice versa*) shall be considered "in [their] true light, regardless of the label that the ... court may have placed on [them]." *Tri–Tron Int'l v. A.A. Velto,* 525 F.2d 432, 435–36 (9th Cir.1975).

3. A patent is presumed to be valid and one challenging its validity bears the burden of proving invalidity by clear and convincing evidence. 35 U.S.C. § 282; *Mas–Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1216 (Fed.Cir.1998).

4. An inventor loses his right to a patent if he has placed his invention "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." *Ferag AG v. Quipp Inc.,* 45 F.3d 1562, 1566 (Fed.Cir.1995), *cert. denied,* 516 U.S. 816, 116 S.Ct. 71, 133 L.Ed.2d 31

(1995); *Pfaff v. Wells Electronics, Inc.,* 525 U.S. 55, 119 S.Ct. 304, 307, 142 L.Ed.2d 261 (1998); 35 U.S.C. § 102. Section 102(b) is designed in part to prevent "inventors from exploiting the commercial value of their inventions while deferring the beginning of the statutory term." *Ferag AG,* 45 F.3d at 1566.

5. "Whether premature acts to commercially exploit a patented invention render the patent invalid is a question of law based on underlying issues of fact." *Weatherchem Corp. v. J.L. Clark, Inc.,* 163 F.3d 1326, 1331 (Fed.Cir.1998).

6. The critical date for the purposes of triggering the section 102(b) on-sale bar is defined to be the date "one-year prior to the U.S. filing date to which the application was entitled." *Mas–Hamilton,* 156 F.3d at 1216.

7. Because the patent application was filed on November 18, 1986, the critical date for the purposes of 35 U.S.C. section 102(b) is November 18, 1985.

8. In support of their respective arguments, the parties rely heavily on the "totality of the circumstances" test previously used by the Federal Circuit in determining whether the section 102(b) on-sale bar has been invoked. Under the "totality of the circumstances" test, all of the circumstances surrounding the sale are considered and weighed against the policies underlying the on-sale bar in determining whether a sale or definite offer for sale has been made. *See Evans Cooling Systems, Inc. v. General Motors Corp.,* 125 F.3d 1448, 1450–51 (Fed.Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1050, 140 L.Ed.2d 113 (1998); *Ferag AG,* 45 F.3d at 1568 ("key question" is "whether, under the totality of circumstances, the inventor placed his invention on sale, objectively manifested by a sale or offer for sale of a product that embodies the invention claimed in the patent"); *Seal–Flex, Inc. v. Athletic Track and Court Constr.,* 98 F.3d 1318, 1322 (Fed.Cir.1996) (on-sale bar represents "balance of the policies" allowing

inventor reasonable amount of time to ascertain commercial value of invention, but requiring prompt entry into the patent system); *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.,* 71 F.3d 1573, 1577 (Fed.Cir.1995) (listing policies).

9. This line of cases also stood "for the proposition that, even though the technical requirements of a reduction to practice have not been met, a sale or a definite offer to sell a *substantially completed* invention, with reason to expect that it would work for its intended purpose upon completion, suffices to generate a statutory bar." *Micro Chem. Inc. v. Great Plains Chem. Co., Inc.,* 103 F.3d 1538, 1545 (Fed. Cir.), *cert. denied,* 521 U.S. 1122, 117 S.Ct. 2516, 138 L.Ed.2d 1018 (1997) (emphasis added). For example, in *UMC Electronics Co. v. United States,* 816 F.2d 647, 657 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988), the court held that the "prior art devices embodied each element of the claimed invention, save one, and that portion was available and had been sufficiently tested to demonstrate to the satisfaction of the inventor that the invention as ultimately claimed would work for its intended purpose." The invention was "substantially completed and there was reason for a high degree of confidence that it would work for its intended purpose." *Micro Chem.,* 103 F.3d at 1545. In contrast, "[i]f the inventor had merely a conception or was working towards development of that conception, it can be said there is not yet any 'invention' which could be placed on sale." *Id.* (quoting *UMC,* 816 F.2d at 657).

10. Shortly after the parties submitted their post-trial memoranda, the Supreme Court in *Pfaff* rejected the "totality of the circumstances" and "substantial completion" tests, indicating a preference for "a definite standard for determining when a patent application must be filed." *Pfaff,* 525 U.S. at ——, 119 S.Ct. at 306; *Brasseler U.S.A. I, L.P. v. Stryker Sales Corp.,* 182 F.3d 888, 889–90 (Fed.Cir.1999). The

inventor in *Pfaff* had shown detailed engineering drawings of his computer chip socket invention to Texas Instruments. In accordance with the inventor's normal practice, he had not made any prototypes before offering his invention for commercial sale. Before the critical date, Texas Instruments provided the inventor with a written order for over 30,000 of his new sockets. Upon receiving Texas Instruments' purchase order, the inventor began to produce the device in commercial quantities. The inventor, however, had not reduced his invention to practice or filled Texas Instruments' order until after the critical date. In light of these facts, the Supreme Court addressed "whether the commercial marketing of a newly invented product may mark the beginning of the 1–year period even though the invention has not yet been reduced to practice." *Pfaff,* 525 U.S. at ——, 119 S.Ct. at 307.

11. Under the standard enunciated in *Pfaff,* the on-sale bar applies when two conditions are satisfied before the critical date. First, the product must be the subject of a commercial offer for sale more than one year before the application for the subject patent. *Pfaff,* 525 U.S. at ——, 119 S.Ct. at 311. Second, the invention must be ready for patenting. *Id.* The latter condition may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention. *Pfaff,* —— U.S. at ——, 119 S.Ct. at 312.

12. In this context, the Supreme Court counseled against the multifactor "totality of the circumstances" test in determining the trigger for the on-sale bar, crediting the Federal Circuit for criticizing such a trigger "as unnecessarily vague." *Pfaff,* 525 U.S. at ——, 119 S.Ct. at 311 n. 11 (citing *Seal-Flex,* 98 F.3d at 1323 n. 2). Similarly, the Court held that "[a] rule that makes the timeliness of an application de-

pend on the date when an invention is 'substantially complete' seriously undermines the interest in certainty." *Id.* at ——, 119 S.Ct. at 311.

■ 13. The court first addresses the applicability of the second element of the *Pfaff* test: whether the invention embodied in the '741 patent was ready for patenting. "The word 'invention' [in section 102(b) ] must refer to a concept that is complete, rather than merely one that is 'substantially complete.' It is true that reduction to practice ordinarily provides the best evidence that an invention is complete. But just because reduction to practice is sufficient evidence of completion, it does not follow that proof of reduction to practice is necessary in every case." *Pfaff,* 119 S.Ct. at 311. In fact, it is immaterial for purposes of the on-sale bar that the device was makeshift. *UMC,* 816 F.2d at 656.

14. In *Pfaff,* the Court held that this second condition was satisfied because the drawings the inventor sent to the manufacturer before the critical date "fully disclosed the invention." *Id.* at ——, 119 S.Ct. at 307. In *Weatherchem,* which present facts similar to those found in the instant action, the Federal Circuit held that the second prong of the *Pfaff* test was satisfied because the inventor had prepared detailed drawings of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention, because the manufacturer was able to readily produce samples of the invention from the drawings and specifications, and finally, because the order of a commercial quantity of the invention before the critical date showed the consumer's confidence that the invention was complete. *Weatherchem,* 163 F.3d at 1333. The court found the invention ready for patenting despite problems in the design at the time the product was offered for sale, noting that all that needed to be done was some "fine tuning" of the invention. *Id.; see also STX, Inc. v. Brine, Inc.,* 37 F.Supp.2d 740, 762–63 (D.Md.1999) (reject-

ing argument that invention required "evaluation period" to determine whether invention worked for intended purpose).

15. Because LTC "does not dispute that the invention of the '741 patent was reduced to practice before November 18, 1985," LTC's Post–Trial Proposed Findings of Fact and Concl. of Law, at ¶ 29, the court concludes that the invention was ready for patenting as of November 18, 1985. *See Pfaff,* 525 U.S. ——, 119 S.Ct. at 311, 142 L.Ed.2d 261.

■ 16. Despite LTC's concession, the court nonetheless finds that a functioning version of the LT1070 which incorporated the '741 patent was available prior to the critical date. Although Nelson discovered problems with the design in mid-November, by November 18, 1985, he concluded that those problems could be corrected. LTC shipped several LT1070s to customers without making Nelson's changes, including samples shipped to sales representatives on November 21, 1985 and a shipment of 400 LT1070s to purchasers on December 29, 1985. At least for the claims LTC asserts against Micrel in this litigation, the '741 invention was reduced to practice before the critical date.

17. The court next tackles the closer question of whether LTC made a commercial sale or offer for sale in the United States prior to the critical date. In making this determination, the key question is whether LTC placed the LT1070 on sale, objectively manifested by a sale or offer for sale of a product that embodies the invention claimed in the patent. *See Ferag AG,* 45 F.3d at 1568 (quoting *Envirotech Corp. v. Westech Eng'g Inc.,* 904 F.2d 1571, 1575 (Fed.Cir.1990)); *Pfaff,* 525 U.S. at ——, 119 S.Ct. at 311–12 (commercial offer of sale occurs "when an invention that is ready for patenting is first marketed commercially").

■ 18. First, the fact that a product is sold or offered for sale to an independently controlled distributor does not exempt the transaction from the on-sale bar.

*In Re Caveney,* 761 F.2d 671, 676 (Fed.Cir. 1985) (citing *General Electric Co. v. United States,* 228 Ct.Cl. 192, 654 F.2d 55, 62 (1981)); *see also Ferag AG,* 45 F.3d at 1567 (transaction between two separate entities, though related, gives rise to on-sale bar). The purchasing public is not limited to the end-users of the product; separate entities such as independently controlled distributors who purchase goods and sell them to end-users are also members of the trade in that product. *Id.; but see Jack Winter, Inc. v. Koratron Co., Inc.,* 375 F.Supp. 1, 36–37 (N.D.Cal.1974), *opinion supplemented,* 409 F.Supp. 1019 (N.D.Cal.1976) (sales of samples to salesmen or intermediaries within inventor-company's "own distribution system" does not constitute "statutory sale," in the absence of evidence of offers to sell or display of samples to public or customers in the trade). It is clear from the testimony that LTC's distributors purchased devices from LTC through the LTC bookings system and resold those devices to end-user customers. As such, if the court concludes based on clear and convincing evidence that LTC sold or offered to sell the LT1070 to any of its independent sales representatives or distributors or if its independent sales representatives or distributors sold or offered for sale the LT1070 to any end-users prior to the critical date, the on-sale bar will be triggered.

19. A single sale or even a single offer for sale is sufficient to trigger the on-sale bar. *Intel Corp. v. International Trade Commission,* 946 F.2d 821, 830 (Fed.Cir.1991); *In Re Caveney,* 761 F.2d at 676. "[W]here there is no sale, a definite offer to sell is an essential requirement of the on-sale bar." *RCA Corp. v. Data General Corp.,* 887 F.2d 1056, 1062 (Fed.Cir.1989) (citing *UMC,* 816 F.2d at 656).

20. An invalidating "offer to sell" may occur as a result of the "patentee's commercial activity which does not rise to the level of a formal 'offer' under contract law principles." *RCA Corp. v. Data Gen-*

*eral Corp.,* 887 F.2d 1056, 1062 (Fed.Cir. 1989) (citing *General Elec. Co. v. United States,* 206 U.S.P.Q. 260, 276–77, 1979 WL 25152 (Ct.Cl.Tr.Div.1979) (analysis of pre-bid activities related to a government contract)). "Even free distribution of a prototype may raise the on-sale bar if it is done to solicit a sale." *Intel,* 946 F.2d at 830 (citing *Stearns v. Beckman Instr., Inc.,* 737 F.2d 1565 (Fed.Cir.1984)).

21. However, "[t]he requirement of a definite offer excludes merely indefinite or nebulous discussions about a possible sale." *RCA,* 887 F.2d at 1062. "[I]nferences of a sale or offer to sell, even if likely, are insufficient to meet the clear and convincing burden of proof." *Senior Technologies, Inc. v. R.F. Technologies, Inc.,* 58 F.Supp.2d 1076, 1092–93 (D.Neb. 1999) (citing *Intel,* 946 F.2d at 830). Similarly, merely "making preparations for the sale" of a claimed invention does not trigger the on-sale bar without a showing by clear and convincing evidence of a definite offer to sell prior to the critical date. *Id.*

Numerous cases have explored the threshold at which efforts at commercialization trigger the on-sale bar. For example, in *Pfaff,* the Court found that the written confirmation by the purchaser, Texas Instrument, of an earlier oral purchase order made it clear that a commercial offer had been made prior to the critical date. *Id.* at ——, 119 S.Ct. at 307, 312; *see also Weatherchem,* 163 F.3d at 1333 (record evidence of a signed purchase agreement before the critical date triggered the on-sale bar). Also, in *STX,* the court noted that prior to the critical date STX's salesperson was "on the road" making sales calls to various retailers and that STX had published a sales brochure referring "to an alleged 'rumor' that it had gone 'a step further with what promises to be an exciting new stick for next season,' and exhorting the faithful to '[l]ook for it towards the end of summer at your favorite sporting goods store.'" *STX,* 37 F.Supp.2d at 756–57. In light of a signed purchase

agreement and despite STX's assertions that the purchaser's order was "merely a hope" for the delivery of products still under development, the court determined that an offer for sale had occurred. *Id.* at 760–61.

23. In *Sonoscan, Inc. v. Sonotek, Inc.,* 936 F.2d 1261, 1263–64 (Fed.Cir.1991), the court determined that the on-sale bar had been triggered from evidence of a price quotation prior to the critical date coupled with the admission from Sonoscan's counsel that if an order had been placed pursuant to the price quotation the invention at issue would have been shipped at the quoted price. In doing so, the court noted that the district court's use of evidence concerning an unrelated sale just after the critical date to infer that no major change occurred in the invention between the pre-critical date price quotation and the later sale was proper. *Id.* at 1264.

24. In contrast, in *Intel,* an administrative law judge in earlier agency proceedings determined that the invention at dispute had been reduced to practice, that prior to the critical date Intel had given samples of the product embodying the invention to Intel sales personnel expected to distribute the samples to their customers, and that Intel was seeking a commercial advantage by its distribution of samples before the critical date. *Intel,* 946 F.2d at 830. From these findings, the court concluded that the on-sale bar had not been triggered because it had not been proved by clear and convincing evidence that samples had been given to customers or that an offer to sell had occurred. *Id.*

25. The testimony adduced during the bench trial indicates that LTC engaged in substantial preparatory activity prior to the formal release of the LT1070 on November 18, 1985, including seeking feedback from its sales representatives and distributors regarding the pricing of the LT1070 and the publication of data sheets and other promotional materials. LTC's activities go beyond the making of mere preparations for the commercialization of the LT1070.

26. LTC's communications with its sales force prior to the critical date clearly indicate that LTC was actively promoting the LT1070 beyond the making of mere preparations for its sale. These communications include the July 1985 sales conference attended by both domestic sales representatives and international distributors, the issuance of the November *Newsline* promising that the LT1070 will be a "big hit," and seminars conducted by LTC's inventor, Carl Nelson, during which he described the LT1070 directly to end-user customers. *See STX,* 37 F.Supp.2d at 756–57. Furthermore, although the Salon des Composants trade show and presentations to European distributors in Paris were not sales activities occurring within the United States, they provide evidence of contemporaneous efforts by LTC to market the LT1070 prior to the critical date.

27. LTC also clearly provided its sales force and end-user customers with critical information regarding the LT1070 in order to generate commercial interest in the LT1070 and expected its sales force to discuss the LT1070 and its functions with end-user customers. The testimony established that data sheets and samples were necessary to offer LTC products for sale to customers. Sales personnel at both Gassner & Clark and Rockmore contacted end-user customers and provided them with preliminary LT1070 data sheets in order to seek design-ins for the LT1070. The use of the preliminary data sheets establishes that discussions between LTC sales representatives and end-user customers extended beyond merely nebulous or indefinite discussions about a possible sale. In fact, these discussions resulted in 26 separate requests for LT1070 samples from its domestic and international sales force between July 17, 1985, the date of the sales conference, and the critical date, clearly demonstrating that LTC's sales force was actively promoting the LT1070

to end-user customers. *See Intel,* 946 F.2d at 830.

28. The court also concludes that LTC's sales efforts coupled with the pre-critical date orders by Microlog, Neye and Svensk establish that LTC offered to sell the LT1070 to these European distributors. Although LTC seeks to characterize these orders as conditional upon the formal release of the LT1070 and listing in the bookings system by its marketing department, it is clear that the entry of the orders for the LT1070 into the bookings system constituted a completed sale. According to LTC policy, the purchase orders received from Microlog, Neye and Svensk were entered into LTC's bookings system under a "will advise" procedure instead of being returned or canceled. Although no "acknowledgments" were sent in response to these orders, it is clear that the distributors were not required to do anything further to have their orders filled after the LT1070 was formally released.

29. Despite LTC's strenuous objections to the contrary, it is of little consequence that LTC did not ship samples of the LT1070 or "formally" book orders from its international or domestic distributors or sales representatives until after the critical date. *See Pfaff,* 525 U.S. at ——, 119 S.Ct. at 307 (inventor had not filled Texas Instruments' order until after the critical date). Moreover, the sheer number of orders booked just after the critical date and the absence of any formal announcement by LTC that the LT1070 had been released until December 1, 1985, add to the evidence that the LT1070 had been offered for sale by LTC prior to the critical date.

30. The court must next address whether the offer for sale occurred in the United States for the purposes of section 102(b). The relevant statute provides in pertinent part that, unlike a disclosure in a printed publication, the on-sale bar applies only to activities that occur in the United States. 35 U.S.C. § 102(b). Thus, whether or not the invention is on sale in a foreign country is irrelevant to whether an on-sale bar may exist. The only relevant inquiry is whether the invention was on sale in the United States.

 32. Sales and offers to sell to foreign customers can invalidate a patent if the sale is made in the United States, if the offer is extended from the United States, or if substantial sales activity prefatory to the sale occurs in the United States. *Robbins Co. v. Lawrence Mfg. Co.,* 482 F.2d 426, 434 (9th Cir.1973) (offer was made from the United States); *Synair Corp. v. American Indus. Tire, Inc.,* 223 U.S.P.Q. 1021, 1022, 1983 WL 52362 (S.D.Tex.1983) (no on-sale bar when all discussions were in Canada); *MDS Assocs. v. United States,* 37 Fed.Cl. 611, 630–31 (1997), *aff'd,* 135 F.3d 778 (Fed.Cir.1998) (pre-contract negotiations, contract amendment negotiations, construction of components, testing, installation and acceptance took place in the U.S., making the sale "in this country" under Section 102(b)).

 33. In the instant action, representatives from Neye, Svensk and Microlog attended the sales conference held by LTC in Santa Clara, California. It was at this sales conference that LTC first initiated its sales efforts of the LT1070 to these distributors. Moreover, the testimony adduced at trial establishes that LTC directed its sales efforts in Europe, including its participation in the Salon des Composants, from its offices located in Milpitas, California. Finally, LTC received and tracked the orders from Neye, Svensk and Microlog from its Milpitas offices. In light of the above, the orders from Neye, Svensk and Microlog constitute sales in the United States that trigger the on-sale bar in part because substantial prefatory activity occurred in the United States.

## CONCLUSION

Based on the above findings of fact and conclusions of law, this court holds that Micrel has met its burden to prove by clear and convincing evidence that the LT1070 was on sale prior to the critical

date of November 18, 1985, and hereby finds for Micrel on its section 102(b) defense. Accordingly, the '741 patent is invalid.

IT IS SO ORDERED.